*340
 
 Chief Judge Breitel.
 

 Plaintiffs, planners of an extensive housing development on land in Saratoga Springs purchased from defendants, seek specific performance of an oral agreement to modify the written agreement of sale. The modification reduced the quantity of the land to be conveyed as a first stage under the written agreement. Supreme Court, after a nonjury trial, ordered that the lesser quantity be conveyed to plaintiffs upon payment in full in cash. From an order of the Appellate Division modifying the judgment to allow plaintiffs to purchase the lesser quantity on credit terms, defendant sellers appeal.
 

 There are two issues of law arising under subdivision 1 of section 15-301 of the General Obligations Law. The statute provides that written agreements expressly proscribing oral modification cannot be changed by oral executory agreement. The first issue is whether partial performance of an oral modification suffices to take the modification out of the statutory requirement of a writing. The second, and alternative, issue is whether equitable estoppel may be invoked to bar a party from relying on the statute. Also at issue, if the oral modification be effective, is the payment term for the modified transaction.
 

 The order of the Appellate Division should be reversed and the judgment of Supreme Court reinstated as provided below.
 
 *341
 
 Partial performance of an oral agreement to modify a written contract, if unequivocally referable to the modification, avoids the statutory requirement of a writing. Moreover, when a party’s conduct induces another’s significant and substantial reliance on the agreement to modify, albeit oral, that party may be estopped from disputing the modification notwithstanding the statute. Finally, because defendant sellers conditioned the reduction in the amount of land to be conveyed upon full cash payment, plaintiff purchasers, by proceeding with the project and the sales of sites and houses, necessarily and impliedly accepted the sellers’ payment term.
 

 On June 26, 1972, plaintiff partnership Develco Associates, expecting to construct an 800-unit housing development, entered into a many-paged written agreement with numerous attachments to purchase from defendant partnership Spa Realty a maximum of 76 acres of land in Saratoga Springs. Under the agreement, conveyance was to be in stages, with the purchasers having a number of options as to the amount of land that would ultimately be purchased. Both the prices and the payment terms, ranging from all cash to specified credit provisions, varied with the quantity of land to be conveyed. The agreeemnt expressly stated that "it may not be changed or terminated orally”.
 

 Had all gone as planned, purchasers would soon have divided the 76 acres into four parcels, delivered to the sellers plans for obtaining the necessary governmental approvals for an initial 48 dwelling units, and taken title for cash to a one-acre subparcel for the construction of at least four model homes. Although neither party was obligated to proceed further unless approvals for at least 150 dwelling units had been obtained, title to parcel number one was to be conveyed by June 1,1973.
 

 But before title to any of the property had changed hands, and while sellers, through their lawyer, were successfully pursuing their obligation to obtain the necessary first 48 approvals, trouble was encountered. The purchasers became aware that, due to the sewage problem, it was unlikely that construction of 150 dwelling units on parcel number one would be approved. As a result, in late November, 1972, Joseph Baratía, one of the purchasers, informed Norman Schlesinger, one of the sellers, that sellers should apply for approval only of a second 48 units.
 

 The trial court expressly found, and it was not at issue in
 
 *342
 
 the Appellate Division, that the sellers had agreed with the suggestion that there be sought, not the additional 102 approvals necessary to reach the 150 minimum of the written agreement, but only a second 48. Although there is some controversy over whether he was acting on behalf of the sellers, the lawyer retained by the sellers to handle the first 48 approvals apparently also acted in connection with the second 48. In fact, on March 9, 1973, Schlesinger wrote the purchasers that, as had been requested, the plans for a second 48 units, and not the originally intended additional 102, had been submitted by the sellers for governmental approvals.
 

 Extensive trial testimony was devoted to the payment term for the 96 unit sites, that precise quantity never having been covered in any of the options in the written agreement. When the manner of payment was first discussed is disputed. But both purchasers and sellers agree: Whenever price was mentioned Schlesinger insisted upon all cash. There was never any writing of any kind fixing the manner of payment.
 

 Despite the understanding of November, 1972 not to proceed with the written plan of conveying 150 units, both parties continued with the "development”. On December 21, title to the one-acre subparcel was closed, and by the following June the four model homes had been completed. Final approvals for the initial 48 units were received in February, 1973, and, as noted, the necessary approvals for the second 48 units were being pursued. Purchasers arranged a promotional "grand opening”, and approximately 19 agreements to purchase were signed by prospective homeowners. Overall, plaintiff purchasers invested substantial sums, allegedly $284,000.
 

 In July, 1973, purchasers sought to close title on the 96 units. But the parties, over a protracted period, could not agree on manner of payment. Purchasers wanted the transaction financed on credit; sellers insisted on all cash. This action for specific performance or money damages followed.
 

 The trial court, as noted, held that the written agreement had been effectively modified to allow purchase of the lesser quantity of 96 units. This holding was not disturbed by the Appellate Division. It is the payment term of the pruchase that is still in dispute. Purchasers argue that the provision in the written agreement governing the sale of 150 units and providing for a one-sixth down payment and a purchase money mortgage is controlling. Sellers, on the other hand,
 
 *343
 
 argue that payment on an all-cash basis inextricably conditioned any modification.
 

 Although the General Obligations Law (§ 5-703, subd 2) subjects the sale of real property to the Statute of Frauds, it was not pleaded by defendants and is therefore not involved in this case.
 

 From the foregoing summary it is evident that there are no significant disputes on the facts. Reversal of the order of the Appellate Division is required for the reasons to follow.
 

 Parties to a written agreement who include a proscription against oral modification are protected by subdivision 1 of section 15-301 of the General Obligations Law. Any contract containing such a clause "cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement * * * is sought”. Put otherwise, if the only proof of an alleged agreement to deviate from a written contract is the oral exchanges between the parties, the writing controls. Thus, the authenticity of any amendment is ensured
 
 (DFI Communications v Greenberg,
 
 41 NY2d 602, 606-607).
 

 On the other hand, when the oral agreement to modify has in fact been acted upon to completion, the same need to protect the integrity of the written agreement from false claims of modification does not arise. In such case, not only may past oral discussions be relied upon to test the alleged modification, but the actions taken may demonstrate, objectively, the nature and extent of the modification. Moreover, apart from statute, a contract once made can be unmade, and a contractual prohibition against oral modification may itself be waived
 
 (Beatty v Guggenheim Exploration Co.,
 
 225 NY 380, 387-388). Thus, section 15-301 nullifies only "executory” oral modification. Once executed, the oral modification may be proved. (E.g.,
 
 Velveray Corp. v Jolo Plastics Corp.,
 
 19 AD2d 69, 70-71, affd 13 NY2d 1165; Semerad, Practice Commentary, McKinney’s Cons Laws of NY, Book 23A, General Obligations Law, § 15-301, p 588; see, generally, 10 NY Jur, Contracts, §404.)
 

 Where there is partial performance of the oral modification sought to be enforced, the likelihood that false claims would go undetected is similarly diminished. Here, too, the court may consider not only past oral exchanges, but also the conduct of the parties. But only if the partial performance be unequivocally referable to the oral modification is the require
 
 *344
 
 ment of a writing under section 15-301 avoided (see, e.g.,
 
 Bakhshandeh v American Cyanamid Co., 8
 
 AD2d 35, 38, affd 8 NY2d 981;
 
 Bright Radio Labs, v Coastal Commercial Corp.,
 
 4 AD 2d 491, 494, affd 4 NY2d 1021; cf. on the parallel rule governing the Statute of Frauds,
 
 Walter v Hoffman,
 
 267 NY 365, 369;
 
 Burns v McCormick,
 
 233 NY 230, 232, 234;
 
 McKinley v Hessen,
 
 202 NY 24, 30; 56 NY Jur, Statute of Frauds, §§245,246).
 

 There is, however, another qualification to the mandates of section 15-301. Analytically distinct from the doctrine of partial performance, there is the principle of equitable estoppel. Once a party to a written agreement has induced another’s significant and substantial reliance upon an oral modification, the first party may be estopped from invoking the statute to bar proof of that oral modification (see, e.g.,
 
 Zolar Pub. Co. v Doubleday & Co.,
 
 529 F2d 663, 667-668; cf.
 
 Imperator Realty Co. v Tull,
 
 228 NY 447, 453;
 
 Thomson v Poor,
 
 147 NY 402, 409-410;
 
 Gray v Met Contr. Corp.,
 
 4 AD2d 495, 497;
 
 The Savage is Loose Co. v United Artists Theatre Circuit,
 
 413 F Supp 555,559). Comparable to the requirement that partial performance be unequivocally referable to the oral modification, so, too, conduct relied upon to establish estoppel must not otherwise be compatible with the agreement as written (see
 
 The Savage is Loose Co. v United Artists Theatre Circuit,
 
 413 F Supp 555, 559,
 
 supra).
 

 In the present case, the conduct of the parties evidences an indisputable mutual departure from the written agreement. To be an effective modification, however, it must satisfy the rules last discussed.
 

 Contrary to the view of the courts below, for purposes of section 15-301 the agreement to modify reached by the parties, even as to the quantity term alone, was not fully executed. Perforce, an "executed” agreement is one that has been fully performed (see 1 Bouvier’s Law Dictionary [Rawle’s 3d rev], Executed Contract, p 1111; cf.
 
 Jemison v Citizens’ Sav. Bank,
 
 122 NY 135, 142-143; see, also, 1 Williston, Contracts [3d ed], § 14). The conduct of both parties indubitably prepared the ground for completion of the sale of 96 unit sites. But title had not been conveyed, and no consideration had changed hands.
 

 Hence, to enforce what is less than a fully executed oral modification, the statute must be satisfied. Even the single Schlesinger letter of March 9, in which he informed purchasers that approval for a second 48 units had been sought, does
 
 *345
 
 not supply the writing required by the statute. It is, at best, an incomplete expression of the parties’ modification agreement. (see
 
 DFI Communications v Greenberg,
 
 41 NY2d 602, 606,
 
 supra;
 
 cf.
 
 Bakhshandeh v American Cyanamid Co., 8
 
 AD2d 35, 37, affd 8 NY2d 981,
 
 supra).
 
 It not only lacked a payment term, but its only true significance was that sellers admitted some arrangement to proceed with the lesser quantity of land. But the modification is not precluded by those circumstances.
 

 As discussed earlier, the parties did not wish to and did not abandon' the enterprise, even on discovering that the first stage of a minimum of 150 units would probably not be approved. Instead, they modified the quantity term to 96 and continued with the enterprise. Additional approvals were sought, four model homes were built, and substantial sums were invested. But, it bears repeating, partial performance alone is not enough; the performance must be unequivocally referable to the oral agreement to modify.
 

 The seeking of the second batch of 48 approvals by sellers, evidenced, among other things, by the Schlesinger letter of March 9, is critical. Instead of applying for approvals of the initially intended additional 102 units to satisfy the original contractual minimum of 150, application for approvals of a second batch of 48 units brought the total to only 96, a shortage of 54.
 

 Nowhere in the written agreement was conveyance of land for 96 units treated. An option to purchase land for only 48 units was included, the payment to be all cash. There was also an option to purchase all of the land at once, the payment to be partially on credit. But nothing pertained to closing title on 96. The partial performance at issue, therefore, is unequivocally referable to the oral modification and is entitled to effect; it was not compatible with any option in the written agreement.
 

 An alternative
 
 ratio decidendi
 
 is applicable. Sellers knowingly acquiesced while purchasers continued to progress the "development”. Sellers were aware of the investment in constructing the model homes, the drawing of plans, and the promotion of the reduced project. Schlesinger even admitted he had visited the model homes. More important, sellers actively lulled purchasers into thinking the oral modification had been accepted. By seeking approval for only a second 48 units, sellers exhibited their agreement to the reduced quan
 
 *346
 
 tity. Key is that such conduct was not otherwise compatible with the written agreement. Sellers are therefore estopped from invoking the statute to bar purchasers’ proof that the written agreement had been orally modified.
 

 Left unresolved by the foregoing is the principal dispute between the parties: the manner of payment for the reduced quantity of land sold. There are credit terms in the written agreement, but they relate to the larger quantities of land originally contemplated for transfer. And the cash terms in the writing relate to even smaller quantities than the 96 units now in dispute. Thus, the conditions for exercising those payment terms are no longer present. Moreover, any attempt to isolate modification of the quantity term from the issue of payment is, as a practical matter, unrealistic.
 

 This is not to say that for lack of an articulated agreement on the payment term no modification was reached. Both parties intended to effect a sale of the lesser quantity of land and acted on that intention. True, Barrata did not in words consent to defendants’ undisputed insistence on cash. But failure to agree expressly on the payment terms does not alone prevent an enforceable agreement (see Restatement, Contracts 2d, § 32, esp Comment a; 1 Williston, Contracts [3d ed], § 37, pp 109-111).
 

 Of course the task of the court would be simpler had the parties, in negotiating the modified agreement, adhered, step-by-step, to hornbook rules of contract formation. But 'that is not realistic. It is more common to find parties disagreeing over terms, yet otherwise proceeding to act as if there were an enforceable agreement. So, too, in the instant case where both parties acted as if the land was to be sold, in the absence of an agreement for other than cash, sellers’ insistence on cash stands. To repeat the words of the Trial Judge, in calling for performance, purchasers "impliedly and necessarily” accepted the terms imposed.
 

 The general rule in the absence of agreement on credit terms for the purchase of property is that cash is required (see, e.g.,
 
 N. E. D. Holding Co. v McKinley,
 
 246 NY 40, 44 [Cardozo, Ch. J.];
 
 Birnhak v Vaccaro,
 
 47 AD2d 915, 916, both cases involving land purchase agreements). In this connection it should be recalled that the option to take title to the land required for 48 home sites was to be for cash. Nor are land transactions requiring cash payment to the seller unusual, it then being the burden, if he cannot pay cash, for the pur
 
 *347
 
 chaser- to arrange for credit financing with a third party. Since this was a development, there would be a quick turnover from resales to home buyers. Indeed, the purchase money mortgage for the first parcel was only for 18 months, and similar provision for comparable short-term mortgages was made for the financing of the other parcels and even for the option to purchase the 76-acre tract at one time.
 

 One final note is needed. Purchasers urge they should still be allowed, even before closing of title to the 96 unit sites, to exercise the option in the written agreement to purchase the entire 76-acre tract. That option was avaiable to purchasers at least until June 1, 1973, and an additional 30-day period to exercise it was afforded by the Appellate Division. The Supreme Court properly conditioned exercise of that as well as all other options available to purchasers under the written agreement upon the prior closing of title to the 96 unit sites. Closing of title to the 96 sites, however, should be extended 30 days after service of the order with notice of entry resettling the judgment at Supreme Court otherwise substantially in the form originally directed by Supreme Court.
 

 Accordingly, the order of the Appellate Division should be reversed, without costs, to reinstate the judgment at Supreme Court except for that court to resettle the date for closing of title to the land for which specific performance has been directed, and to provide any other directions appropriate to effecting the resolution of the issues as previously determined by it and now by this court, in accordance with this opinion.
 

 Judges Jasen, Gabrielli, Jones, Wacthler, Fuchsberg and Cooke concur.
 

 Order reversed, without costs, and the case remitted to Supreme Court, Saratoga County, for the entry of judgment in accordance with the opinion herein.