**In re TELE/RESOURCES, INC., Debtor.**

**Bankruptcy No. 80 B 20398.
Adv. No. 81 ADV 6107.**

United States Bankruptcy Court,
S. D. New York.

July 1, 1982.

Rogers & Wells, New York City, for Citibank, N.A.

Coudert Brothers, New York City, for Newmarket Co. Ltd.

Katz, Robinson, Brog & Seymour, P. C., New York City, for debtor; Jeffrey L. Zivyak, New York City, of counsel.

HOWARD SCHWARTZBERG, Bankruptcy Judge.

Citibank, N.A., the holder of a secured claim against the debtor's assets under a written security agreement for advances made to the debtor, Tele/Resources, Inc., before the commencement of this Chapter 11 case, has moved for summary judgment with respect to its adversary action to obtain the proceeds of federal, state and local tax refunds received by the debtor, which are subject to its lien. Newmarket Company Limited, an intervenor defendant who resists Citibank's motion for summary judg-. ment, advanced $250,000 to the debtor to meet operating expenses. This advance, although subsequent to Citibank's security interest, is the basis for Newmarket's position that Citibank's acquiescence to Newmarket's $250,000 loan to the debtor resulted in a subordination or assignment to Newmarket of Citibank's secured priority status to the extent of the $250,000 advance.

The debtor also opposes Citibank's motion for summary judgment and argues that if Citibank surrendered a $250,000 portion of its secured claim in order to bestow upon Newmarket a senior secured status for the $250,000 advance, Newmarket's failure to file a financing statement in accordance with the requirements of the Uniform Commercial Code, as adopted in New York, renders such asserted secured interest vulnerable to the avoiding powers of a trustee in bankruptcy under Code § 544, which the debtor in possession may assert under Code § 1107. Newmarket, in response, contends that the transaction should be regarded as an assignment to it of Citibank's security interest in the collateral to the extent of

$250,000, rather than viewed as a subordination, since an assignment need not be reflected by a filed financing statement and entitles Newmarket to the coverage obtained by Citibank through the latter's filed financing statement, pursuant to New York U.C.C. § 9–302(2).

Citibank counters that there are no genuine triable issues of fact and that the debtor's assertion of avoiding powers is academic because Citibank signed no written document of subordination or assignment in favor of Newmarket, and therefore Newmarket's $250,000 loan to the debtor in the face of Citibank's perfected security interest in all of the debtor's personal property rights resulted in Newmarket obtaining a junior status to Citibank's secured interest in the debtor's personal property, including the tax refunds.

The parties do not dispute that Citibank is entitled to summary judgment for all tax refunds received by the debtor in excess of the $250,000 in question.

In January and May of 1980, the debtor applied for federal tax refunds for the fiscal years of 1979 and 1980 in connection with carryback losses referable to 1977 and 1978. Approximately $329,886 of federal tax refunds were placed in a segregated account pending the resolution as to their entitlement. Moreover, proceeds of state and local tax refunds have been received by the debtor and additional refunds are claimed by the debtor to be due and owing.

All of the events in question in this case took place before September 5, 1980, when the debtor filed with this court its voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.* and continued in possession and management of its business as a debtor in possession in accordance with 11 U.S.C. § 1108. A reorganization that would allow for the continued existence of the debtor was not feasible with the result that the debtor sold its business to another company and proceeded along the course of liquidation, as permitted under 11 U.S.C. § 1123(b)(4).

## UNDISPUTED FACTS

On July 20, 1977, the debtor and Citibank entered into a revolving credit agreement pursuant to which Citibank agreed to and did make certain advances to the debtor as a result of which Citibank presently claims an unpaid balance of approximately $1,274,-000. A relevant portion of that agreement provides as follows:

"*Section 8.02. Amendments, Etc.* No amendment, modification, termination or waiver of any provision of this Agreement or of the Note or any of the other Loan Documents nor consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be in writing and signed by the Bank and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No notice to or demand on the Borrower in any case shall entitle it to any other or further notice or demand in similar or other circumstances."

As security for such advances, the debtor and Citibank executed a General Security Agreement dated July 20, 1977, pursuant to which Citibank received a security interest in all of the debtor's personal property rights, including all of its inventory, equipment, "contract rights, accounts receivable, *general intangibles* ... and all bank balances" of the debtor [Emphasis added]. The security agreement also provided that the debtor would not, without obtaining Citibank's prior written approval, "create, incur, assume, or suffer to exist any security agreement subject to the Uniform Commercial Code ...". A restriction against oral modification was also contained in the General Security Agreement which provided in part as follows:

"[N]one of its terms or provisions may be waived, altered, modified, limited or amended except by an agreement expressly referring hereto and to which you [Citibank] consent in writing duly signed for you and on your behalf ...".

The revolving credit agreement between the debtor and Citibank was amended on October 19, 1978. A second amendment,

dated January 15, 1980, provided that specific advances by Citibank were to be secured by specific tax refunds covered by Citibank's General Security Agreement.

Financing Statements covering Citibank's security interest in the debtor's assets were filed by Citibank in 1977 and 1978 with the Department of State of the State of New York and various other county clerks in New York counties and in other states in which the debtor had places of business.

In March of 1980, the debtor was faced with a cash shortfall and need to cover operating expenses. The debtor's president, Roger Lewis, approached Citibank for an additional loan of approximately $500,000 to continue the debtor's operations. Citibank turned down the debtor's request for the $500,000 additional loan and proposed instead a number of alternatives, including the debtor's use of cash from anticipated tax refunds resulting from previous year's losses of the debtor. However, the anticipated tax refunds failed to arrive in timely fashion. Thus, still faced with a cash deficiency, as well as Citibank's refusal to extend additional cash credit, the debtor's then president, Roger Lewis, approached Newmarket Company Limited, a United Kingdom corporation, and requested a loan in the amount of $250,000, with interest at Citibank's prime rate. The debtor's president proposed that Newmarket's $250,000 advance could be secured by the anticipated tax refunds. Citibank does not dispute Newmarket's assertion that the debtor's then president, Roger Lewis, proposed the loan transaction to Newmarket with Citibank's knowledge, encouragement and agreement.

The factual underpinnings for Newmarket's loan to the debtor are set forth in the May 26, 1982 affidavit of the debtor's former president, Roger Lewis, that was submitted by Newmarket in opposition to Citibank's motion for summary judgment. Citibank accepts the facts set forth in this affidavit, but disagrees with the interpretation and legal conclusions drawn by Newmarket from these facts, which were stated in relevant part as follows:

"8. On April 3, 1980, I executed, on behalf of Tele/Resources, a Promissory Note to Newmarket in the principal amount of $250,000, with payment of principal and interest to be secured by, and to be paid from, Tele/Resources' federal income tax refund for the year 1977, when received. A copy of this April 3, 1980 Promissory Note is annexed to this Affidavit as Exhibit A.

9. On or before April 28, 1980, I instructed Mr. Michael Silverman, then Vice President/Finance of Tele/Resources, to transmit to Ms. Mary D. Neumann of Citibank, a copy of the April 3, 1980 Tele/Resources Promissory Note to Newmarket. This was sent to Ms. Neumann at her request. A copy of Mr. Silverman's letter to Ms. Neumann and the enclosed copy of the Promissory Note is annexed hereto as Exhibit B.

10. Upon the receipt of anticipated federal tax refunds by Tele/Resources in or about April of 1980, as to which I promptly notified Citibank, I considered it desirable to use the proceeds of those refunds for additional Tele/Resources working capital where serious cash deficiencies persisted. I therefore approached Newmarket again, with Citibank's prior knowledge, agreement and consent, to request a "roll over", or extension of the April 3, 1980 Promissory Note, with payment of that Note to be made from, and secured by, Tele/Resources' anticipated 1980 federal tax refund.

11. Newmarket, with the explicit understanding that Citibank was in agreement, granted this extension, and on April 30, 1980, I executed, on behalf of Tele/Resources, an Amendment to the April 3, 1980 Promissory Note with Newmarket (the "Amendment"), securing payment of the outstanding $250,000 principal amount by the federal income tax refund then owed Tele/Resources by the Internal Revenue Service for the year 1980. A copy of the Amendment is annexed hereto as Exhibit C.

12. On May 2, 1980, I confirmed to Newmarket, via a telex to Mr. Peter Smith, a Director of Newmarket, Citibank's agreement and consent to assigning, subordinating and otherwise releasing its security interest in Tele/Resources' 1980 federal tax refunds. A copy of my telex to Mr. Smith is annexed hereto as Exhibit D.

13. Citibank's agreement to assigning, subordinating and otherwise releasing its claimed security interest as to Tele/Resources' 1980 federal tax refunds to Newmarket was formally confirmed in a letter presented to me by Citibank, dated June 9, 1980. Citibank acknowledged in its June 9, 1980 letter its "consent" to Tele/Resources' payment to Newmarket of the $250,000 with interest at Citibank's prime rate from Tele/Resources' 1980 federal tax refund. A copy of this letter is attached hereto as Exhibit E. The June 9, 1980 letter was not accepted by me on advice of counsel, who objected to Citibank's inclusion of request that Tele/Resources acknowledge that its tax refunds were subject to the Bank's security agreement. However, that portion of Citibank's letter which expressed Citibank's consent to the assignment, subordination and release of its security interest in favor of Newmarket reflected the true prior agreement of the parties on this issue."

Apart from the affidavit of the debtor's former president, Roger Lewis, and the supporting exhibits, Newmarket did not submit any additional facts in opposition to Citibank's motion for summary judgment. Significantly, Newmarket did not submit any affidavits from its employees who participated in the $250,000 loan to the debtor, nor did Newmarket submit any proof from representatives of Newmarket that they believed or relied upon Citibank's alleged agreement to subordinate or assign its senior secured interest to Newmarket to the extent of $250,000.

## DISCUSSION

Summary judgment is a drastic remedy, since it cuts off a party's right to present his case and, therefore is available only under limited circumstances. In deciding a motion for summary judgment the court does not try issues of fact; "it can only determine whether there are issues to be tried" and in so doing "must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought." *Heyman v. Commerce and Industry Insurance Co.,* 524 F.2d 1317, 1320 (2d Cir. 1975); *United States v. Diebold,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). The moving party has the burden of demonstrating the absence of any material factual issue genuinely in dispute. *Heyman v. Commerce and Industry Insurance Co.,* supra. Rule 56 of the Federal Rules of Civil Procedure, which authorizes summary judgment in appropriate cases, is made applicable in adversary proceedings in bankruptcy cases by Bankruptcy Rule 756. The rule permits a party to pierce allegations of fact in the pleadings and to obtain relief by summary judgment where facts set forth in detail in affidavits, admissions, and materials extraneous to the pleadings show that there is no genuine issue of material fact to be tried.

## SECURITY INTEREST IN TAX RETURNS

The July 20, 1977 Security Agreement that was entered into between the debtor and Citibank, and with respect to which appropriate Uniform Commercial Code filings were effected by Citibank, describes the secured collateral so as to include "general intangibles." It is now settled law in this circuit that tax refunds are regarded as "general intangibles" as that term is defined in New York Uniform Commercial Code § 9–106. *In re Metric Metals International, Inc.,* 20 B.R. 633 (Bkrtcy.D.C.S.D. N.Y.1981) affirmed without opinion by the Second Circuit Court of Appeals on April 19, 1982 (Docket No. 81–5066). In that case District Court Judge Henry F. Werker said:

"The next issue that must be resolved is whether tax refunds may properly be considered general intangibles. General

intangibles are defined in the code as 'any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments and money.' N.Y.U.C.C. § 9–106 (McKinney 197). Although there is little authority with respect to whether a tax refund is a general intangible, the cases and commentators that have addressed the question agree that tax refunds constitute general intangibles as defined in the Code. See *In re Certified Packaging, Inc.*, 8 U.C.C.Rep. 95 (D.C.Utah 1970); P. Coogan, W. Hogan & D. Vagts, 1 *Secured Transactions Under the Uniform Commercial Code* § 5A.09[1](19). In a similar vein, it has been held that money that a claimant expects to recover in a lawsuit is a general intangible. *Board of County Commissioners v. Berkeley Village*, 40 Colo.App. 431, 580 P.2d 1251 (1978). Based upon the foregoing, I conclude that an anticipated tax refund constitutes a general intangible."

Citibank perfected its secured interest in the debtor's anticipated tax refunds by filing U.C.C. financing statements in 1977, 1978 and 1980 with the New York Department of State and the various counties where the debtor maintained offices. Under New York Uniform Commercial Code § 9–301(1)(a), "an unperfected security interest is subordinate to the rights of . . . persons entitled to priority under Section 9–312." The latter section provides that conflicting security interests rank according to priority in time of filing or perfection. In the instant case, Newmarket concedes that it did not file any U.C.C. financing statements with respect to its claim to the debtor's tax refunds to the extent of the $250,000 loan. Therefore its position hinges upon whether or not Citibank subordinated or assigned its secured senior interest to Newmarket to the extent of the $250,000 advance.

## SUBORDINATION—THE DEBTOR'S POSITION

■ The debtor argues that, in so far as its rights are concerned, there is a differ-ence between a subordination by Citibank of a portion of its secured interest in favor of Newmarket and an assignment of that interest to Newmarket. The debtor agrees with Newmarket that any assignment of a portion of Citibank's secured claim to Newmarket is of no comfort to the debtor, since an assignee of a secured interest may rely upon the assignor's perfection under the Uniform Commercial Code and need not independently file a financing statement with respect to the assigned interest. However, the debtor maintains that a subordination of a portion of Citibank's secured interest in favor of Newmarket does not allow Newmarket to remain under the umbrella of Citibank's perfected interest and that Newmarket must file a financing statement in accordance with the Uniform Commercial Code in order to perfect its secured interest. Absent such perfection, (which Newmarket concedes did not occur) the debtor reasons that it may assert the bankruptcy trustee's avoiding powers under Code § 544, as granted to a debtor in possession under Code § 1107. This position is based on the theory that a subordination of a portion of Citibank's secured interest somehow effected a release or freeing up of that portion from Citibank's perfected security to the extent of the subordinated amount. Therefore, the debtor reasons that in order for Newmarket to acquire a secured interest in the subordinated interest that Citibank "released", Newmarket must independently comply with the Uniform Commercial Code and perfect its interest, which it failed to do. Thus the debtor asserts that the "released" portion of Citibank's security interest remains unperfected by any entity, so that the debtor may don the mantle of a hypothetical lien creditor, pursuant to Code § 544 and 1107, and defeat Newmarket's interest for the benefit of the creditors of this estate.

Although the debtor cannot find any authority to support this novel theory, the court need not tarry with the debtor's argument in this case because, as between the debtor and Citibank, it matters not whether Newmarket's position is based on the theory of subordination or assignment. A subordi-

nation by Citibank in favor of Newmarket is no more a release of its perfected secured position to any other parties than is an assignment. Whatever rights Newmarket may claim as a result of its dealings with the debtor may not detract from Citibank's position vis a vis the debtor that it holds a perfected interest in the debtor's tax refunds and that there are no written documents executed by Citibank to the contrary. Hence, Newmarket's claim to a subordination or assignment from Citibank by estoppel, waiver, silence, conduct of the parties or whatever, cannot serve as an erosion of Citibank's perfected claim as to any other parties, including the debtor.

## ASSIGNMENT OR SUBORDINATION IN FAVOR OF NEWMARKET

■ Newmarket's failure to file a Uniform Commercial Code financing statement to perfect its claim for a $250,000 portion of the debtor's tax refund is not fatal to its position in this case. Newmarket contends that Citibank assigned or subordinated its security interest in favor of Newmarket to the extent of $250,000. There is no requirement that an assignment must be filed in order for it to be effective against creditors of the debtor. Indeed, New York Uniform Commercial Code § 9–302(2) specifically provides:

"If a secured party assigns a perfected security interest, no filing under this Article is required in order to continue the perfected status of the security interest against creditors of and transfer from the original debtor."

See *CIM International v. United States,* 641 F.2d 671, 676–677 (9th Cir. 1980); *In re Bollinger Corp.,* 614 F.2d 924, 928 fn.5 (3rd Cir. 1980). The obstacle confronting Newmarket is not its failure to file a financing statement. What is lacking in this case is a writing signed by Citibank to prove the existence of an assignment or subordination.

■ Newmarket's $250,000 loan to the debtor was reflected by the debtor's promissory note dated April 3, 1980. There has not been produced any written document signed by Citibank to indicate that it either assigned or subordinated to Newmarket any portion of its security interest in the debtor's tax refund. Thereafter, on April 28, 1980, the debtor sent Citibank a copy of the promissory note. On April 30, 1980, the debtor executed another $250,000 promissory note, which was a "roll over" or extension of the April 3, 1980 note. As in the case of the first note, there has not been produced any written documentation executed by Citibank to reflect that it assigned or subordinated any portion of its security interest in favor of Newmarket. On May 2, 1980, after the debtor's issuance of the second promissory note to Newmarket, the debtor's former president, Roger Lewis, confirmed to Newmarket, via a telex, that Citibank "HAS NO OBJECTION LOAN WITH TAX CREDIT COLLATERAL AS DISCUSSED." Once again, there was no production of any writing signed by Citibank with regard to any subordination or assignment. The oral discussions between the parties resulted in Citibank's preparation of a proposed letter agreement addressed to the debtor and to be signed by Citibank and the debtor, dated June 9, 1980, which provided in relevant part:

"You have requested permission from us to retain the Federal Tax Refund of $305,896 for which you applied and in connection with which you have received $270,549 for working capital purposes, although the same is *subject to our security interest* and would, if we so requested, be required in accordance with our Agreements to be delivered to us and applied to the reduction of your obligations to us.

.     .     .     .     .

You have also advised us that you have borrowed $250,000 from Newmarket Company, Ltd., after receiving permission from us to repay the same, together with interest out of the tax refund of approximately $850,000 which you anticipate receiving from the United States Internal Revenue Service by reason of net operating losses in the fiscal year ending April 30, 1980. By signing this letter on the following page you have acknowledged

*that such tax refund is subject to our security interest.* On the understanding that you will promptly file for such tax refund, and request expedited payment thereof, we consent to your making such payment to Newmarket Company, Ltd." [Emphasis added]

The debtor would not sign the June 9th letter agreement because Citibank stated therein that the debtor's tax refund "is subject to our security interest", and thus the letter remained unexecuted by both parties.

Under certain circumstances, a subordination agreement may be oral, since New York Uniform Commercial Code § 1–201 provides that the bargain of the parties may be found "in their language or by implication from other circumstances including the course of dealing or usage of trade or course of performance . . .". However, the General Security Agreement under which Newmarket bottoms its asserted secured interest provides otherwise; a written document signed by Citicorp is the *sine qua non.*

Thus, Newmarket's reliance upon Citibank's oral expressions and acquiescence with respect to its $250,000 loan to the debtor in order to establish Citibank's assignment or subordination of a portion of its interest under the written revolving Credit Agreement and the General Security Agreement is misplaced in the light of New York General Obligations Law § 15–301(1). This section bars the enforcement of oral agreements in the following language:

"A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent."

The statute serves to protect parties to a written agreement who have included a proscription against oral modification in the agreement and on its face bars recovery by any party to a written agreement who attempts to enforce an oral modification of the written agreement's terms. Hence, the letter could not function as a signed writing between Citibank and the debtor that could alter the original written agreement between these two parties. At best, the letter was

"an unsigned memorandum of the terms of a discussion indicating an intention to change the original agreement. In other words, the statute [former NYPPL § 33–c(1), now NYGOL § 15–301(1)] is not satisfied by a written memorandum of an oral agreement. It specifically calls for a written agreement." *Bakhshandeh v. American Cyanamid Co.,* 8 A.D.2d 35, 185 N.Y.S.2d 635, 637, (A.D. 1st Dept. 1959).

Of course, if an oral agreement modifying a written agreement has been acted upon to completion, the written agreement no longer needs the protection of § 15–301(1), and in effect the contractual prohibition against oral modification may be waived, taking the written agreement out of the statute's protection. See, *Rose v. Spa Realty Associates,* 42 N.Y.2d 338, 397 N.Y.S.2d 922, 366 N.E.2d 1279 (1977); *Citibank (New York State) N.A. v. E. J. Zibro Tire and Appliance Co., Inc.,* 72 A.D.2d 846, 421 N.Y.S.2d 699 (1979). However, the courts have also recognized that an underlying written agreement may be removed from the protection of § 15–301, based on a partial performance or equitable estoppel theory. Where one party to an underlying written agreement has performed its part of the orally agreed upon terms, the courts will consider the action taken by that party and strip the written agreement of its protection under § 15–301 provided that the part performance is " 'unequivocally referable' to the oral agreement." *Bright Radio Laboratories v. Coastal Commercial Corp.,* 4 A.D.2d 491, 166 N.Y.S.2d 906, 909 (1st Dept. 1957); *Bakshandeh v. American Cyanamid, Co.,* 8 A.D.2d 35, 185 N.Y.S.2d 635 (1st Dept.1959). As an alternative to a partial performance theory, the courts use an equitable estoppel principle to grant relief to a party to a written agreement who was induced to take a significant course of action

in reliance on oral representations made by another party to the written agreement. The reneging party may be estopped from repudiating the oral modification, notwithstanding § 15–301(1), if the conduct offered to establish estoppel was inconsistent with the terms of the underlying written agreement. See, *Rose v. Spa Realty Associates*, supra; *Zolar Publishing Co. v. Doubleday & Co.*, 529 F.2d 663 (2d Cir. 1975); *The Savage is Loose Co. v. United Artists Theatre Circuit*, 413 F.Supp. 555 (D.C.S.D.N.Y.1976).

Citibank's General Security Agreement with the debtor under which Newmarket claims a portion of the collateral by virtue of an assignment or subordination to it of Citibank's Security interest to the extent of $250,000, expressly provides that it may not be "waived, altered, modified, limited or amended" except by a written document signed by Citibank. It is therefore protected by § 15–301(1). However, Newmarket looks to the equitable estoppel and partial performance theories to support its contention that its action in lending funds to the debtor to the tune of $250,000 was induced by its reliance on Citibank's oral acquiescence to the transaction, or alternatively, since Newmarket performed its part of the oral agreement with Citibank, the bank should not be allowed to repudiate the oral agreement by insisting now on its prior secured status in the $250,000.

Curiously, Newmarket relies on *Rose v. Spa Realty Associates*, supra. In *Rose*, two parties to a *written agreement* entered into an oral agreement on which one of the parties took action. In trying to enforce the new oral agreement, the performing party sought to remove the underlying agreement from the protection of § 15–301(1) by relying on the equitable estoppel and partial performance theories discussed supra. In citing *Rose*, Newmarket fails to discern the crucial point that cases construing New York General Obligations Law § 15–301(1) in connection with the estoppel or partial performance principles contemplate factual scenarios where there is: (1) *an underlying written agreement between the parties*, containing a clause barring any changes in the written agreement absent a

writing; (2) subsequent action taken by one of the parties to the written agreement pursuant to an oral agreement that another party seeks to renounce, and (3) the application of a partial performance or estoppel theory to prevent the repudiation of the now partially executed oral agreement. See, e.g. *Rose v. Spa Realty Associates*, supra; *Bright Radio Laboratories v. Coastal Commercial Corp.*, supra; *Bakshandeh v. American Cyanamid Co.*, supra; *Central Trust Company Rochester, N. Y. v. Bagliore*, 78 A.D.2d 764, 433 N.Y.S.2d 883 (4th Dept. 1980).

In the instant case, Citibank had an underlying written agreement with the debtor; the debtor had a written agreement with Newmarket (the promissory note and security agreement); *but Newmarket was not a party to any written agreement with Citibank.* Therefore, its attempt to enforce the oral agreement with Citibank on an estoppel or partial performance theory has no foundation, because there is no reason to analyze Newmarket's actions in that framework if these actions were taken pursuant to an oral agreement that did not arise out of a written agreement between Newmarket and Citibank. The purpose of § 15–301 is to protect parties to a written agreement who have voluntarily included a clause prohibiting oral modification from attempts to orally rewrite the agreement. *A fortiori*, the statute would serve to bar a third entity who was not even a party to the underlying written agreement (from which springs the modifying oral agreement) from trying to attack that written agreement by claiming reliance on oral statements of one of the parties to the written agreement. See, *Bright Radio Laboratories v. Coastal Commercial Corp.*, supra, at 166 N.Y.S.2d 909. The only entities who could seek relief herein on a partial performance or equitable estoppel theory for action taken in connection with an oral agreement would be Citibank or the debtor, the parties to the written agreement, not Newmarket, who was never a party to any written agreement with Citibank. Indeed, Newmarket itself emphasizes the point in its June 25 letter to

the court submitted in further support of its position in which it states at p. 2:

"1. As made clear in Newmarket's June 2, 1982 Memorandum of Law in Opposition to Citibank's Motion for Summary Judgment, at 12, Newmarket was never a party to the 1977 Credit Agreement which the Bank now seeks to invoke against Newmarket."

Newmarket cannot butter its toast on both sides. On the one hand, it denies being a party to the written Credit Agreement and General Security Agreement executed between Citibank and the debtor, bolstering its argument that therefore it is not bound by any clause in such written agreements requiring a writing to alter them. Notwithstanding this denial, Newmarket makes an "about face" and argues for the application of the partial performance or equitable estoppel theories to except the written agreements from the scope of New York General Obligations Law § 15–301(1) when Newmarket itself was never a *party* to the *written* Credit or General Security Agreements that were the subject of the attempted oral modification.

This is not a case involving a party's oral waiver of a right to require another party to a contract to perform, as was involved in the recent case of *Nassau Trust Company v. Montrose Concrete Products Corp.*, 56 N.Y.2d 175, 451 N.Y.S.2d 663, 436 N.E.2d 1265 (1982). In that case the Appellate Division was reversed because it "erred in failing to distinguish between an oral agreement that purports to modify the terms of a prior written agreement and an oral waiver by one party to a written agreement of a right to require of the other party certain performance in compliance with that agreement" (p. 7). The New York Court of Appeals held that in a foreclosure action based upon nonpayment, the mortgagee's oral waiver of the right to accelerate the principal and foreclose in order to give the delinquent mortgagor a reasonable opportunity to negotiate an unforced sale of the mortgaged premises constituted a valid defense to foreclosure, absent withdrawal of the waiver upon reasonable notice to the mortgagor. However, it must be emphasized that the Court of Appeals decision reflects that even in a case concerning oral waiver of the terms of a written contract, action must have been taken by a party to that written contract in reliance on the oral waiver of the other party.

In the instant case, this court has explained that Newmarket was not a party with Citibank to a written agreement whose terms might be the subject of a unilateral waiver by Citibank. Indeed, this case does not concern a purported waiver of written terms, but rather an attempted oral modification, as to which the Court of Appeals case, supra, rightly draws an analytical distinction. Newmarket claims that Citibank and the debtor orally modified the Security Agreement by agreeing that the debtor could borrow $250,000 from Newmarket and that the debtor could collateralize this loan with a portion of the tax refund covered by Citibank's secured interest. Newmarket further claims that this oral agreement enures to its benefit as a third party beneficiary. However, it cannot be more emphatically reiterated that a stranger cannot elbow its way into an oral modification agreement made by two other parties who have between themselves executed a written agreement out of which the oral agreement arose; take action on the oral statements made by one of the parties to the written contract, and then demand relief via estoppel or partial performance theories when the oral representations made by the party to the written agreement are not honored. A stranger to a written contract that forbids oral modifications may not compel one of the parties to that contract to perform other than as provided under the contract, except pursuant to another written agreement signed by the party to be charged. This conclusion is compelled by the express language in N.Y. General Obligations Law § 15–301(1).

Even if this court were to accept Newmarket's contention (which it does not) that the discussions between the parties and their conduct could result in an effective

modification or waiver of Citibank's General Security Agreement to the extent of an assignment or subordination of a portion of Citibank's secured interest, there is, nevertheless, another flaw in Newmarket's opposition to Citibank's motion for summary judgment. Neither the debtor nor Newmarket has offered any facts other than those furnished by Roger Lewis, the debtor's former president. No representative of Newmarket has come forward to say that he or she relied upon Citibank's oral agreement to its transaction with the debtor, or to dispute or add any facts to those contained in the Lewis affidavit.

Accordingly, there is no material factual issue genuinely in dispute. Newmarket may not rely upon any purported oral modification of the Security Agreement between the debtor and Citibank. Newmarket must produce a written agreement signed by Citibank, which admittedly does not exist. Even if the absence of a written agreement could be excused on the basis of an estoppel or partial performance, the affidavit of the debtor's former president, Roger Lewis, cannot be regarded as evidence of the fact that Newmarket relied upon an oral modification assigning or subordinating any portion of Citibank's secured interest under its Security Agreement to Newmarket. Reliance is a subjective element. The debtor's former president is not in a position to raise this issue on behalf of Newmarket.

For the foregoing reasons, Citibank's motion for summary judgment is granted.

SUBMIT ORDER ON NOTICE.