Bernard J. KAMIN, Plaintiff,

v.

Daniel KOREN, Defendant.

MOSPORT PARK (GRAND PRIX), INC., Plaintiff,

v.

NEW YORK GRAND PRIX INC. and Daniel Koren, Defendants.

Nos. 85 Civ. 6410 (EW), 85 Civ. 6411 (EW).

United States District Court, S.D. New York.

Nov. 4, 1985.

Kaplan Kilsheimer & Foley, New York City, for plaintiffs; Richard J. Kilsheimer, of counsel.

Shereff, Friedman, Hoffman & Goodman, New York City, for defendants; Andrew J. Levander, Gary R. Clewley, Alyson B. Cummings, of counsel.

OPINION

EDWARD WEINFELD, District Judge.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

These actions center about contracts with respect to a proposed Grand Prix automobile race to be conducted in New York City.

Bernard J. Kamin, the plaintiff in one action, is a lawyer of Toronto, Canada, who, in addition to his legal activities, is employed by Mosport Park, Ltd., a Canadi-

an corporation, in an entreprenurial as well as legal capacity. Mosport Park (Grand Prix), Inc., the plaintiff in the other action, is a Canadian corporation formed as an affiliate or subsidiary of Mosport Park, Ltd., to enter into agreements that are the subject of this action (both are referred to hereafter as Mosport).

The defendants are New York Grand Prix, Inc., a New York State corporation organized to promote a "Grand Prix Race" in the greater New York metropolitan area and Daniel Koren, its chief executive officer. Koren had been active in the promotion, development and construction of that project for several years prior to November 12, 1984, when the agreements here at issue were entered into and continued with such activities thereafter. Associated with him in the initial stages of the venture were John Rosart and his affiliates ("Rosart" or "Rosart interests").

A project of this nature requires substantial financing, construction of a racing site, public relations, engineering, architectural and landscaping services, sales promotion and various other activities. In addition, it requires the authorization and approval of an international supervisory group known as the Formula One Constructors Association ("FOCA"), which was granted sometime in 1982. The project, from its inception in 1981, ran into the not unusual delays encountered in negotiations with departments, boards and agencies of New York City, whose consents were required with respect to various aspects of the project as it moved forward, which included but was not limited to environmental impact statements, building, fire and other permits and approvals. Although much progress had been made with respect to these matters under the executive leadership of Koren and substantial funds, almost $1 million, had been advanced by John Rosart, also a Canadian citizen, and members of his family, in November 1984 the project was still in the developmental state

and in need of additional financing. Prior thereto, Rosart, for whom Kamin had performed some legal services in real estate matters, met with Harvey M. Hudes, also a Canadian citizen who was president and general manager and a principal of Mosport and associated with Kamin. Hudes and Kamin were experienced in the development and promotion of racing projects in Canada and other countries.

Following a number of conferences among Hudes, Kamin, Koren and Rosart, a series of agreements were entered into on November 12, 1984, which are at the heart of this litigation. As one of the parties to subscription and shareholders agreements,[1] Mosport agreed to purchase 1,295 shares of New York Grand Prix for $500,000, of which $50,000 was payable upon execution of the agreements, the balance of installments of $50,000 each on December 1, 1984 and January 1, 1985; $200,000 on February 1, 1985 and $150,000 on March 1, 1985, the latter two payments subject to deferral, dependent upon the date a contract was entered into with the City of New York permitting the New York Grand Prix race. The shareholders agreement also provided that the Rosart interests and Koren, who already had invested heavily in New York Grand Prix, each contribute shares to the capital of New York Grand Prix under a recapitalization provision. In addition, Rosart agreed to purchase 1,295 additional shares of New York Grand Prix payable in installments, the first of which, $50,000, was paid upon execution of two subscription agreements and like installments payable on December 1, 1984 and January 1, 1985; $200,000 on February 1, 1985 and $150,000 on March 1, 1985, the latter two, however, subject to deferment dependent upon the date of the contract between the New York City Parks Department and New York Grand Prix. The shareholders agreement provided that New York Grand Prix would enter into four-year consulting agreements with Mosport, the Rosart interests and another shareholder, Connor Clark

---

1. Plaintiffs refer to the shareholders agreement as a "Management and Recapitalization Agreement."

& Company, Ltd. The shareholders agreement also provided that New York Grand Prix would continue to employ Koren as President and Chief Executive Officer for four years.

All agreements, however designated— the shareholders agreement, the subscription agreements, the consulting agreements and the employment agreement— were executed simultaneously. The shareholders agreement contained a provision for a Board of Directors of three and that the shareholders vote their shares in favor of Koren, Rosart and one individual designated by Mosport as directors, and to cause the election of Koren as Chief Executive Officer.

The subscription agreements provided that no shares subscribed for thereunder were to be issued to the subscriber until the full purchase price had been paid; further, that in the default of payment of installments due for subscribed shares, all payments previously made and rights to shares were forfeited; and all monies paid converted into a ten-year subordinated loan bearing interest.

It is undisputed that Mosport paid the first installment upon execution of the contracts, but did not pay the installments due on December 1, 1984 and January 1, 1985, each in the sum of $50,000. However, plaintiffs contend that on April 22, 1985, the shareholders agreed to amend the November 12, 1984 agreement and chose not to treat Mosport's nonpayment of the installments as a default. The alleged agreement was oral. The defendants deny there was a modification of the terms of the original agreement.

At a meeting of the Board of Directors of New York Grand Prix held on August 15, 1985 (not attended by Kamin) Koren and Rosart terminated the Mosport consulting agreement for cause because of Mosport's default in the payment of the amounts due under the Mosport subscription agreement. At a special meeting of shareholders held on the same day, Koren and Rosart voted to remove Kamin as a director based upon Mosport's failure to pay the balance of the payments due under the subscription agreement, which resulted in "ill will" among the directors and because Kamin's continued presence on the Board was "disruptive" and his "unilateral actions in the past were potentially dangerous to the Corporation [New York Grand Prix]." [2]

The two plaintiffs, Kamin and Mosport, in their respective actions seek the following relief: an accounting by Koren as a director and President of New York Grand Prix; the removal of Koren as chief officer and director of New York Grand Prix; a declaration that New York Grand Prix breached the consulting agreement by failure to pay $43,750, the amount claimed by Mosport for services rendered; a declaration that the subscription agreement was amended on April 22, 1985, so that Mosport was not in default thereunder by reason of the nonpayment of installments as specified in the agreement of November 12, 1984; specific performance of the claimed amended agreement allegedly entered into on April 22, 1985; and a declaration that Kamin continues to be a member of the Board of Directors. The defendants categorically deny the default was waived and the plaintiffs' charges and dispute plaintiffs' various claims for relief.[3]

Upon commencement of these actions, plaintiffs moved for a preliminary injunction, which the defendants opposed. How-

---

**2.** *See* Defendants' Exh. F, at 4. Koren and Rosart's shares represented 95% of the outstanding shares. Herb Abramson, representing the only other shareholders, Connor Clark & Company and Technifund, Inc., was also present at the shareholders meeting but abstained from voting those shares.

**3.** Plaintiffs argue that although the Rosart interests failed to make any installment payments after the initial payment of $50,000 on November 12, 1984, no action has been taken against them. Plaintiffs ignore the fact that Rosart, having previously invested $900,000 in New York Grand Prix, was a shareholder, unlike Mosport. Furthermore, whatever claims, if any, New York Grand Prix may have against Rosart, they are irrelevant to those asserted by plaintiffs and are not issues in this case.

ever, the case was tried upon the merits pursuant to Fed.R.Civ.P. 65(a)(2). The principal witnesses who testified were Kamin and Hudes on behalf of plaintiffs and Rosart on behalf of the defendants. Their testimony as to significant matters was in sharp conflict.

Based upon the Court's trial notes, which include a contemporaneous appraisal of each witness, a word-by-word reading of the post-trial stenographic transcript of the trial record, the demeanor of the witnesses, an evaluation of their credibility and the reasonable inferences to be drawn from established facts and surrounding circumstances, this Court concludes that plaintiffs have failed to sustain their burden of proof. Kamin's penchant for writing letters containing self-serving statements and his testimony with glib and ready explanations of adverse events are not a substitute for facts. The Court finds that neither he nor Hudes were credible witnesses as to material matters.

 In the light of the default upon the failure to pay the $100,000 due on December 1, 1984 and January 1, 1985, plaintiffs nonetheless contend that this did not affect Mosport's claim under the consulting agreement nor Kamin's right to remain as Mosport's designee on the Board of Directors under the shareholders agreement. As previously noted, they assert that the default was waived orally and a new agreement entered into which substantially modified the written agreements of November 12, 1984. The Court finds otherwise. Under the shareholders agreement, Mosport agreed to purchase 1,295 shares of New York Grand Prix for a total purchase price of $500,000 "subject to the terms and conditions of a Subscription Agreement of even date which is attached hereto as Exhibit C." That subscription agreement pro-

vided that "no shares ... shall be issued to the undersigned until the full purchase price has been paid." Thus, Mosport never became an unconditional shareholder of New York Grand Prix. While the interested parties discussed the plaintiffs' default, it was never waived and no new agreement was entered into. Moreover, the shareholders agreement itself provides that "no modification, amendment, or waiver of any provision of this Agreement shall be effective unless in writing and signed by the parties against whom enforcement thereof is sought."[4] Under New York law, such provisions are binding on the parties absent a showing that an oral agreement was entered into and that there was partial performance or substantial reliance.[5] Plaintiffs have made no such showing.

The agreements entered into on November 12, 1984 were central to one another; they were interdependent and so understood by the parties and accordingly, defendants were justified in declaring the consulting agreement at an end and to remove Kamin as Mosport's designated member of the Board of Directors by reason of that default. The fact that the agreements did not state *in haec verba* they were interdependent does not control. "[S]eparate written agreements executed at the same time may be considered in law as one agreement, but only if the parties so intended. Whether the parties intended that the ... agreements should be interdependent is a question of fact which turns upon the circumstances of each case."[6] The evidence fully establishes the agreements were interdependent and that the parties so intended. The circumstances preceding, leading to and surrounding their execution indicate that intent. While each agreement was executed separately, each is made part

---

4. Plaintiffs' Exh. 1, para. 10.2.

5. *See Grandonico v. Consortium Communications Int'l, Inc.*, 566 F.Supp. 1288 (S.D.N.Y.1983); *Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 366 N.E.2d 1279, 397 N.Y.S.2d 922 (1977); *Cliffs Management Corp. v. Great Eastern Management Corp.*, 85 A.D.2d 584, 445 N.Y.S.2d 460 (1981), *appeal dismissed*, 56 N.Y.2d 643, 436

N.E.2d 194, 450 N.Y.S.2d 787 (1982); *see also* N.Y.Gen.Oblig.Law § 15–301 (McKinney 1963 & Supp.1984–1985).

6. *Lowell v. Twin Disc, Inc.*, 527 F.2d 767, 769–70 (2d Cir.1975); *see also Dynamics Corp. of America v. International Harvester Co.*, 429 F.Supp. 341, 345–46 (S.D.N.Y.1977).

of the shareholders agreement either as an attached exhibit or by reference. It is beyond peradventure that the consulting agreement would not have been entered into absent Mosport's agreement to purchase and pay for shares of stock in New York Grand Prix.

While plaintiffs contend that the consulting agreement was entered into to secure their expertise in auto racing, the fact is that the project was well on its way before they entered into the contracts. While their expertise was known, the evidence sustains a finding it was the funds to be derived from Mosport's purchase of stock that was the prime consideration for the November agreements and the evidence leaves little room for doubt that no contract would have eventuated had Mosport not committed itself for the $500,000 for the purchase of stock.[7] To hold that these were separate and independent agreements having no relationship to one another not only is contrary to the intent of the parties as manifested by all of the surrounding circumstances, but flies in the face of common sense.[8]

Even if the consulting agreement survived plaintiffs' default, Mosport did not render any compensable services. Analysis of the alleged services for which compensation is now sought indicates they were inquiries of architects, public relations counsel and others as to the progress of the project. These inquiries were in plaintiffs' self-interest in seeking to maintain their position in New York Grand Prix despite their default and by no fair standard were they consultation services rendered on behalf of the defendants for which they are entitled to compensation.

The insignificance of the alleged services for which Mosport claims $43,750 was perhaps best described by a public relations consultant to New York Grand Prix, without any interest in the outcome of the litigation. He and his firm had served in that capacity from the very inception of the project, and the witness testified that Kamin would call him from time to time on an irregular basis to obtain information as to how things were moving—"he would call and want to know how things were, what was happening, and I would describe and sort of bring him up to date.... I cannot remember Mr. Kamin making any suggestion as to how I should proceed or should not proceed."[9]

Plaintiffs contend that the removal of Kamin from the Board of Directors by the shareholders violated the shareholders agreement and was unlawful. New York Grand Prix's by-laws provide for the removal of directors at any time "with or without cause."[10] The evidence at trial supports a finding that Kamin's removal was justified whether with or without cause. Moreover, Mosport's right under the shareholders agreement to designate a member of the Board of Directors was dependent upon its being a shareholder of New York Grand Prix. As noted above, upon Mosport's default after making the first payment of $50,000, it was not entitled to receive shares of stock, none were issued to it, and the $50,000 was converted into a subordinated loan. Kamin is not entitled to reinstatement on the Board of Directors.

█ Finally, plaintiffs allege Koren issued two New York Grand Prix checks, one in the sum of $3,500 and the other in the sum of $20,000, upon his sole signature and contrary to a requirement of the shareholders agreement that checks in excess of $2,000 be countersigned by one other officer and checks in excess of $5,000 be countersigned by two other officers. Accordingly, plaintiffs urge that these actions warrant the removal of Koren as an officer

---

7. Tr. at 235–36.

8. *Cf. Rudman v. Cowles Communications, Inc.,* 30 N.Y.2d 1, 280 N.E.2d 867, 330 N.Y.S.2d 33 (1972); *Ripley v. International Rys. of Central America,* 8 N.Y.2d 430, 171 N.E.2d 443, 209 N.Y.S.2d 289 (1960).

9. Tr. at 306–08.

10. Defendants' Exh. H, at 6; *see also* N.Y.Bus. Corp.Law § 706 (McKinney 1963 & Supp.1984–1985).

and director. While the physical signature of another officer does not appear on the checks at issue, Rosart, whose testimony the Court finds credible on this and other matters, testified that because he was in Toronto at the time, he telephoned an executive at the Bank where New York Grand Prix funds were on deposit and authorized the payment of the checks, the payees of which had rendered services to New York Grand Prix and to whom the amounts of the checks were due. It is undisputed that both checks were issued in payment of obligations due to the payees from New York Grand Prix. While the check for $20,000 signed by Koren and approved by Rosart did not contain a third signature as required under the shareholders agreement and therefore breached that agreement, the Court finds the issuance of that check in payment of a corporate debt did not result in any damage to plaintiffs or New York Grand Prix. In the absence of injury to Mosport, assuming it was a shareholder at the time of the issuance of the check, or to New York Grand Prix, that single incident furnishes no ground for plaintiffs' contention that Koren should be removed from his position as an officer and director of the corporation.[11] This was no instance of diversion of corporate funds.

The foregoing shall constitute the Court's findings of fact and conclusions of law. Judgment may be entered accordingly.

SO ORDERED.

---

[11]. *Cf. O'Toole v. Greenberg*, 64 N.Y.2d 427, 477 N.E.2d 445, 488 N.Y.S.2d 143 (1985); *Swiss Forest Homeowners Ass'n, Inc. v. Ole Olsen, Ltd.*, 38 A.D.2d 619, 326 N.Y.S.2d 366 (1971); *Lewis v. Lewis*, 59 Misc.2d 525, 299 N.Y.S.2d 755 (Civ.Ct. 1969).