■ GRACIE GARDENS OWNERS CORP., Appellant, v GRACIE GARDENS Co., Respondent.—Order of the Supreme Court, New York County (Andrew R. Tyler, J.), entered December 14, 1988, is reversed, on the law, to the extent appealed from, and Gracie Gardens Co.'s (GGC) motion for summary judgment dismissing the co-op's claim for breach of contract and unjust enrichment (the first and fourth causes of action of the complaint) is denied, without costs or disbursements.

In 1979, defendant Gracie Gardens Co. sold Gracie Gardens to SSD Properties Corp. (SSD). GGC took back a mortgage in the principal amount of $7,250,000, executed by SSD.

In 1981, Gracie Gardens was converted to cooperative ownership and title was conveyed to plaintiff Gracie Gardens Owners Corp. The co-op thereupon became liable to GGC on the mortgage. The principal balance due on the note was reduced to $6,000,000, payable on November 15, 1990, with interest at 6% per annum.

Plaintiff co-op, by its officer and director, Lawrence Goldschmidt, approached Paul Powsner, attorney for Arthur Reiss, GGC's general partner, to inquire about the possibility of prepaying the $6,000,000 mortgage held by GGC as mortgagee at a 15% discount.

With regard to the possibility of the 15% discount of the $6,000,000 mortgage, Goldschmidt approached Powsner in November 1984. At the time, Goldschmidt and Powsner were partners at the same law firm. Powsner told Goldschmidt he would ask Reiss and would then let him know.

After talking to Reiss, Powsner reported to Goldschmidt that Reiss was receptive to giving a 15% discount for prepayment. Nothing, however, had been reduced to writing, nor were any details discussed.

Not until a year later, in November of 1985, did Goldschmidt approach Powsner to again request the 15% discount. Powsner relayed Goldschmidt's second prepayment request to Reiss. Reiss said he would "look favorably" upon the prepayment discount if it were paid "right after the first of the year [so] that he could use the money for some other venture".

Accordingly, Powsner told Goldschmidt that "Reiss said he was receptive to it, provided it was paid in early January".

On January 15, 1986, prior to paying the nonrefundable fees on the new loan commitment, Goldschmidt called Powsner and told him that the co-op had obtained a commitment on a new loan and thus, he wanted to confirm GGC's agreement to accept prepayment at the 15% discount before the co-op made the required deposit with the new loan company. Powsner said he would get back to Goldschmidt. Soon thereafter, Powsner called Goldschmidt and informed him of GGC's agreement to the 15% discounted prepayment.

Acting with the understanding the GGC had agreed to a 15% prepayment discount, the co-op accepted the new loan commitment and paid a $110,000 nonrefundable deposit and a $110,000 broker's fee.

On January 21, 1986, Goldschmidt forwarded the signed commitment letter, along with a partial deposit payment, to the new loan company.

Prior to February 3, 1986, Goldschmidt had a further telephone conversation with Powsner, when the remaining deposit was sent to the new loan company. Powsner again confirmed the prepayment agreement.

With respect to the January 1986 and February 1986 conversations between Goldschmidt and Powsner, Powsner denies that the conversations ever took place.

In March 1986, an associate of Goldschmidt called Powsner's office for copies of the underlying mortgage documents in preparation for the closing of the co-op's refinancing.

When Powsner learned of this request, he promptly called Goldschmidt and told him not to assume that he still had a deal for a prepayment discount because payment had not been paid early in January.

A meeting took place on March 6, 1986 between Goldschmidt, Reiss and several others. Goldschmidt claims that he told Reiss that the co-op needed the prepayment discount to complete the refinancing loan to pay off the existing mortgage debt and to make physical repairs to Gracie Gardens. He also noted that the co-op was by then exposed to a mortgage broker's fee and a commitment deposit previously paid to a new lender.

The co-op's refinancing closed on April 11, 1986. The $6,000,000 note was paid in full (no discount).

On May 30, 1986, the co-op commenced this action alleging four causes of action: (1) breach of contract; (2) fraud; (3) economic duress; and (4) unjust enrichment.

GGC moved for summary judgment on the grounds that the co-op's claims were barred absolutely by the Statute of Frauds and by General Obligations Law § 15-301, and the IAS court granted the motion to the extent of dismissing the co-op's claims for breach of contract and unjust enrichment.

An issue is presented as to whether GGC should be equitably estopped from asserting the affirmative defenses of General Obligations Law § 15-301 and the Statute of Frauds because the co-op reasonably and rightfully relied upon the oral modification, to its detriment.

Concededly, an analysis of the reasonableness of appellant's claimed reliance must be considered in light of the well-settled rule that the doctrine of equitable estoppel should be applied with great caution when dealing with realty (*Nassau Trust Co. v Montrose Concrete Prods. Corp.*, 56 NY2d 175; *Rose v Spa Realty Assocs.*, 42 NY2d 338, 344; *Huggins v Castle Estates*, 36 NY2d 427).

We believe that there are unresolved questions of fact in this case which must be addressed before it can be concluded whether or not equitable estoppel should apply.

There is no question that the parties orally agreed to prepayment of the note at a discount. According to affidavits and deposition testimony of the co-op's witnesses, GGC confirmed the prepayment agreement on two separate occasions in January 1986 and again in early February 1986, in each instance knowing full well that the co-op was committing itself to its refinancing program in reliance on GGC's commitment to the discounted prepayment agreement.

The parties dispute whether GGC required prepayment in early January 1986 as a condition of the prepayment agreement. While GGC contends that Powsner had no written authority from GGC to enter into the prepayment agreement, the same principles of equitable estoppel that would preclude GGC from denying the substance of the prepayment agreement would also preclude it from denying Powsner's authority to negotiate and enter into an agreement on its behalf (*see, e.g., Rende & Esposito Consultants v St. Augustine's R. C. Church*, 131 AD2d 740, 743). Moreover, Powsner and Reiss have both admitted that Powsner conveyed the co-op's prepayment request to Reiss and that Reiss agreed to the request on behalf of GGC.

Accordingly, the issue of equitable estoppel, as well as other factual questions which are raised by the first and fourth causes of action asserted by plaintiff, merit a trial. Concur—Carro, Asch and Rubin, JJ.

Kupferman, J. P., dissents and would affirm for the reasons stated by Tyler, J.