**MERRILL LYNCH INTERFUNDING, INC., Plaintiff,**

**v.**

**Patrick ARGENTI and Jean Argenti, Defendants.**

No. 92 Civ. 2507(TPG).

United States District Court, S.D. New York.

Sept. 2, 1997.

Sanford Asher, Jaffe and Asher, New York City, for Plaintiff.

Peter S. Herman, McLaughlin & Stern, LLP, New York City, for Defendant.

## AMENDED OPINION

GRIESA, Chief Judge.

Merrill Lynch Interfunding, Inc. ("MLIF") has sued Patrick and Jean Argenti to collect several million dollars worth of notes signed by the Argentis. These notes were partial guarantees for money that MLIF had advanced to Argenti, Inc., a company that MLIF and the Argentis jointly owned. The Argentis have counterclaimed to the effect that MLIF breached an agreement to provide additional financing to Argenti, Inc. and breached its fiduciary duty.

In this opinion Patrick Argenti will be referred to "Argenti," and Argenti, Inc. as "the Company."

*The Verdict and Judgment*

After a six-week trial to a jury, the issues as to liability were presented to the jury first. The first interrogatory asked:

> Do you find that Merrill Lynch Interfunding, Inc. made a contract with Argenti, Inc. and Mr. and Mrs. Argenti and breached that contract?

The jury answered in the affirmative. The second interrogatory asked:

> Do you find that Merrill Lynch Interfunding, Inc. committed a breach of fiduciary duty?

The jury answered in the affirmative.

After these answers were received the damage issues were submitted to the jury. The Argentis had three theories of damages. The first was that MLIF's wrongdoing had caused the collapse of the Company, which had in turn resulted in the Company not being able to pay its notes, thus making the Argentis liable on their guarantees. The second theory of damages was that Argenti had suffered a loss of compensation from the Company. The third theory was that Argenti suffered a loss of profits and value in respect to his interest in the Company.

The first damage interrogatory submitted to the jury was:

> Do you find that, as a result of Merrill Lynch not performing the contract, Mr. and Mrs. Argenti were damaged by being required to pay the notes relating to the Merrill Lynch advances to Argenti, Inc.?

Three possible answers were set forth.

> Yes, entirely
> Yes, in part
> If so, by what percentage?
> No

The jury answered Yes, in part, and by a percentage of 75%.

The jury also found, in response to the second interrogatory, that Argenti had lost compensation in the amount of $737,500. In response to the third interrogatory, the jury found that Argenti had not suffered damages in the form of lost profits or value relating to the Company.

The jury was also asked whether they found the same or different damages relating to MLIF's breach of fiduciary duty. The jury found the same damages.

In connection with the entry of judgment on the basis of the verdict, there was considerable argument. The theory of the Argentis was that the court should assume no breach of the terms of the Company's or the Argentis' notes, and then calculate the amount of principal and interest which would have been due from the Company on its notes. This amount (approximately $6 million) would then, under the jury verdict, be discounted by 75%. The Argentis would be liable on their guarantee for the appropriate portion of the remaining 25% of the Company's obligation. From this amount would be deducted the sum of $737,500, representing damages suffered by Argenti in the form of lost compensation.

The court basically agreed with the method of calculation proposed by the Argentis. This resulted in the entry of a judgment in favor of MLIF and against the Argentis in the amount of $735,179.

## Post–Trial Motion

MLIF has filed a post-trial motion requesting various forms of relief.

1. MLIF moves for judgment as a matter of law setting aside the jury's finding of breach of contract. MLIF asserts that this verdict is contrary to law by virtue of the Statute of Frauds and certain no-oral-modification clauses in prior instruments. MLIF also argues that the verdict of the jury on the contract issue was not supported by the evidence.

2. MLIF argues that it is entitled to judgment as a matter of law setting aside the jury's verdicts as to breach of fiduciary duty. MLIF argues that there is no legal basis for liability on this theory, and that the verdict was not supported by the evidence.

3. In the alternative, MLIF requests a new trial on both the contract and fiduciary duty issues, arguing that there were errors in the court's instructions.

4. As to the damage verdicts, MLIF argues that it is entitled to judgment as a matter of law setting aside the lost compensation award because the jury overlooked an undeniable element of mitigation.

5. In the alternative, MLIF requests a new trial on the damages issues, arguing that the first interrogatory about damages relating to the notes was improperly phrased.

6. MLIF requests that the judgment be amended. MLIF basically reiterates the arguments made prior to the entry of the judgment.

The court grants MLIF's motion for judgment as a matter of law setting aside the jury verdicts as to breach of fiduciary duty. MLIF's motion is in all other respects denied.

## Facts

Argenti is in the clothing business. Jean Argenti is his wife. Argenti founded the Company to produce and sell women's dresses made of Chinese silk, and was able to offer them at relatively low prices. The Company was initially quite successful, and attracted the attention of MLIF.

MLIF is a subsidiary of Merrill Lynch, and makes investments in businesses hoping for a profit from their appreciation in value.

On November 10, 1988 MLIF entered into a leveraged buy-out agreement with the Company. The mechanics took the form of MLIF lending the Company $11.5 million and agreeing to a $3.5 million line of credit. The Company made a $10 million distribution to Argenti. The Company retained $1.5 million of the loan and had the benefit of the line of credit. Under a Stockholders Agreement dated November 10, 1988 MLIF effectively obtained a 40% interest in the Company. It received one share of stock in the Company at the time, but had a right to purchase the remainder of a 40% share of the Company's stock for a nominal amount, which it exercised later. MLIF had the right to appoint two of the Company's five directors.

The $11.5 million loan and the $3.5 million line of credit were secured by a Loan and Security Agreement dated as of November 10, 1988, which granted MLIF a security

interest in substantially all of the Company's assets.

At the time of the transaction, the Company had a factoring arrangement with the CIT Group. Financing of receivables with a factor was vital to the Company's business.

Sometime after the leveraged buy-out the Company began to experience a downturn, which Argenti contends was caused by a recession in the United States and by supply problems in China.

On November 22, 1989 MLIF advanced the Company $800,000 and Argenti advanced the Company $1.2 million.

On July 13, 1990 there was a restructuring. Outstanding principal and interest due on the November 1988 lending were converted to a Junior Term Note in the amount of $16,541,-118. Interest was to be paid commencing December 31, 1995 and principal was due September 30, 2000. The new note was subject to the November 1988 Loan and Security Agreement, referred to thereafter as the "Junior Merrill Agreement."

At the same time, MLIF advanced an additional $5 million to the Company. Also, MLIF purchased the $1.2 million November 1989 advance from Argenti. A new note was issued by the Company dated as of July 13, 1990 to cover the 1989 advances and the $5 million current advance. The amount of the new note was $7,146,222. This is referred to as the "Senior Merrill Loan." It was covered by a Loan and Security Agreement dated July 13, 1990, referred to as the "Senior Merrill Agreement." Interest was to be paid beginning September 30, 1990 and principal was to be paid in installments from March 31, 1991 through December 31, 1995.

In a somewhat complicated form, the details of which need not be described here, the Argentis in effect guaranteed 53.01% of the Senior Merrill Loan. The amount of the guarantee was $3.7 million and the Argentis gave MLIF a promissory note in that amount dated as of July 13, 1990. The details of the arrangement were set forth in a document called the "Participation Agreement," dated July 13, 1990. The schedule of principal and interest payments coincided with the schedule in the note given by the Company. The

Argentis executed a Security Agreement dated July 13, 1990 relating to the $3.7 million note, pledging a number of works of art. In addition, the Argentis executed a Mortgage Deed dated July 13, 1990 covering real estate in Greenwich, Connecticut.

In November 1990 MLIF advanced an additional $1.5 million to the Company. The Company gave a Special Advance Note dated as of November 29, 1990, providing that principal would be paid on March 31, 1992 and that interest payments would start March 31, 1991. The Argentis guaranteed half of that advance by executing an Additional Promissory Note in the amount of $750,000 dated as of November 29, 1990, with the same schedule of principal and interest payments as in the Company note.

In March 1991 MLIF advanced another $1.5 million to the Company. The Company gave a Second Special Advance Note dated as of March 11, 1991 with principal due on June 30, 1992 and interest payments starting June 30, 1991. Under the usual procedure the Argentis gave a Second Additional Promissory Note in the amount of $750,000 dated as of March 11, 1991 with the same schedule of principal and interest payments as in the Company note.

Another advance in the amount of $3 million was made by MLIF to the Company in May 1991. The Company gave a Third Special Advance Note dated as of May 10, 1991, with principal to be paid June 30, 1992 and interest payments to start September 30, 1991. The Argentis gave a Third Additional Promissory Note in the amount of $1.5 million dated as of May 10, 1991 with the same schedule of principal and interest payments as in the Company note.

MLIF advanced the Company another $500,000 in September 1991. This was reflected in a Fourth Special Advance Note dated as of September 18, 1991 providing for principal to be paid December 31, 1993 and interest payments to start on September 30, 1991. The Argentis gave a Fourth Additional Promissory Note in the amount of $250,-000 dated as of September 18, 1991 with the same schedule of principal and interest payments as in the Company note.

In September 1991 MLIF agreed to postpone the payment schedules of the notes for the three previous advances, both as to the Company and the Argentis, to match the schedule for the fourth advance. The notes for the three earlier advances were amended as of September 18, 1991. The amended notes of the Company were denominated as follows:

Amended Special Advance Note

Amended Second Special Advance Note

Amended Third Special Advance Note

The amended notes of the Argentis: were:

Amended Additional Promissory Note

Amended Second Additional Promissory Note

Amended Third Additional Promissory Note

At times, MLIF made the advances on a certain date and had the documents effective as of a certain date, but the actual preparation, signing and delivery of the documents occurred subsequently. All the documents are not in evidence, but the following is illustrative. The Company's note for $3 million dated as of May 10, 1991 was signed on September 18, 1991. The Argentis' Third Additional Promissory Note for $1.5 million dated as of May 10, 1991 was signed on September 18, 1991. The Fourth Additional Promissory Note dated as of September 18, 1991 was signed on October 30, 1991. The amendments to the notes given by the Argentis in connection with the November 1990, March 1991 and May 1991 advances were dated as of September 18, 1991 but were not signed until October 30, 1991. The Company's Fourth Special Advance Note dated as of September 18, 1991 and the amended notes covering the three prior advances were not signed until December 24, 1991.

At each stage, appropriate amendments were made to the Company's Loan and Security Agreement (the Junior Merrill Agreement) dated as of November 10, 1988. The amendments provided that the new advances to the Company were secured under the agreement. In connection with the Argentis' personal notes, at each stage there were appropriate amendments to the Participation Agreement, the Security Agreement and the Mortgage Deed to reflect that the amounts of the additional notes were being secured under the Security Agreement and the Mortgage Deed.

By 1991 the Company was attempting to replace its factor, CIT, with a new factor, Congress Talcott Corporation ("Congress"). This change offered the prospect of a substantial improvement for the Company. Throughout the year the Company implemented strict cost-cutting measures in an effort to make the Company acceptable to Congress. In the first week of September 1991 Congress indicated that it was willing to become the Company's factor if the Company could meet certain terms.

Both the Company and MLIF participated in the negotiations with Congress. MLIF was desirous of having the new factor for the Company. During the negotiations, David Blumberg, an MLIF employee and member of the Company's board of directors, told Argenti that the Company should not make its September 1991 interest payments to MLIF, since Congress would require a one year deferral of interest payments in order to bolster the cash position of the Company. In a letter dated September 18, 1991, Michael Shef, the Company's attorney, wrote to Linda Berman, an attorney representing MLIF, to confirm that the following three quarters of payments would also be deferred. Berman responded that "three quarters of payments under certain of the notes will be deferred only if the deal with Congress is closed."

A closing with Congress was scheduled for October 15, but was postponed until October 31. On October 8 Argenti met with representatives of MLIF and Congress. By this time the new date of October 31 had been agreed upon. At this meeting Argenti explained to Congress and MLIF that the Company had ordered over 200,000 garments to be shipped from China in early November, and that if the closing were delayed any further, the Company would lose a great deal of money and reputation.

On October 10 Congress informed the Company and MLIF that it would require the Company to raise an additional $1 million

cash collateral before going ahead with a new factoring arrangement. The amount of cash collateral then in the hands of the factor CIT was $6.5 million. Blumberg informed Argenti that in return for advancing an additional $1 million, MLIF wanted certain concessions in addition to the Argentis' usual guarantee of half the new advance. MLIF wished to have an additional 9 percent ownership in the Company, raising its share to 49 percent. The chief financial officer and the outside accountant would need to be replaced. MLIF desired to change the composition of the Company's board of directors. As of this time Argenti was chairman and had the right to nominate two other members. MLIF had the right to nominate two members. MLIF wished to have Argenti replaced as chairman by an independent director. This would leave Argenti and MLIF with two seats each. Argenti could serve as a director, but would not be chairman.

In the course of the discussions, MLIF indicated to Argenti and Congress its agreement to the $1 million advance, and Argenti agreed to the terms requested by MLIF. Congress was satisfied on that basis and was prepared to become the Company's factor.

The last days of October were devoted to working out the precise wording of the documents and arranging other details necessary for the closing, which was scheduled for the afternoon of October 31.

On October 29 MLIF, Congress and Argenti held their final meeting before the scheduled closing. This was at the offices of Congress's attorneys. Argenti and the attorney Shef attended. Martin Schwartz, executive vice president of Congress and chief loan officer of the Factoring Division, was at the meeting. Two other Congress employees— Al Reisman and Jonathan Helfat—were there. Harvey Appelle and Daniel Tully Jr. of MLIF attended, as did the attorney Berman. Both Argenti and Schwartz testified that at the conclusion of this meeting they understood that the matter was set for closing two days later. The testimony of the MLIF witnesses is somewhat contradictory to this, indicating, without being very specific, that there was some expression of doubt about the ability to close.

After the Congress representatives left, there was some discussion between the Company representatives and the MLIF representatives. There is a sharp conflict in the evidence about what this discussion involved. There is also a sharp conflict about what occurred, and what conversations there were, the next day, October 30. In substance, the testimony on the Argenti side is that, despite a brief personal flare-up between Argenti and Daniel Tully, Jr. on October 29, Appelle stated at that time that MLIF was ready to close on the 31st and that there was no communication to the contrary on the 30th. The MLIF witnesses assert that on the 29th and on the 30th they raised concerns with Argenti and with Congress, and warned Argenti that MLIF had problems with the transaction which put the closing in doubt. The differences between the two versions will be discussed in more detail later in this opinion.

Shef, the Company's attorney, and Berman, the attorney for MLIF, were engaged in preparing the documents. Shef and Berman settled on the final wording of the documents on the 29th, subsequent to the meeting described above. That same day, Berman's law firm, Hahn & Hessen, sent the Argentis those documents requiring both their signatures. At Berman's direction, the documents were sent by Denise Riordan, a paralegal at Hahn & Hessen, with a covering letter reading:

October 29, 1991

*BY HAND*

Mr. Patrick Argenti

Argenti, Inc.

512 Seventh Avenue

New York, New York 10018

Dear Mr. Argenti:

Enclosed please find execution copies of the following documents:

1. Fifth Additional Promissory Note $500,000—1 copy

2. Fourth Amendment to Security—4 copies

3. Mortgage Deed—4 copies

4. Term Sheet—4 copies

5. Deferral Letter—4 copies

Please have the documents signed and return all copies to Michael Shef, Esq. at Parker Chapin Flattau & Klimpl.

If you have any questions regarding the enclosures, please do not hesitate to contact us.

Very Truly Yours

/s/ s/ Denise J. Riordan

Denise J. Riordan

Legal Asst.

The Term Sheet (usually referred to as the Term Letter) and the Deferral Letter contained a complete recital of the terms of the agreement. Both documents had signature lines for MLIF, the Company, and the Argentis. The other three documents sent to the Argentis were the Fifth Additional Promissory Note, reflecting the Argentis' guarantee of half the new $1 million advance, and amendments to the Security Agreement and Mortgage Deed. These three documents were to be executed by the Argentis pursuant to the terms of the agreement.

Also on October 29, Shef delivered to Argenti the amended notes relating to the first three advances and the note regarding the fourth advance (all dated as of September 18, 1991) for signature by the Argentis.

Berman called Argenti once on the 29th and once on the 30th to ask Argenti if he had signed the documents and if he had any questions. On October 30, 1991, the Argentis signed all the documents and returned them to Shef, as requested.

At about 12:30 p.m. on October 31, 1991, approximately two hours before the scheduled closing, Appelle informed Argenti that MLIF did not intend to go ahead with the transaction.

MLIF's sudden withdrawal had far reaching effects. Congress withdrew. CIT, the Company's current factor, froze the Company's accounts. The Company was unable to acquire goods in any quantity. On February 10, 1992 MLIF declared the loans in default and on February 14 the Company filed in bankruptcy. MLIF eventually received approximately $1.2 million from the liquidation of the Company, half of which it credited against the Argentis' outstanding notes.

Sometime thereafter, Patrick Argenti formed a new clothing company, Patrick A., Inc. In July, 1992 he sold 60% of the stock in Patrick A., Inc. to other investors for approximately $1.09 million. In addition, between 1992 and 1995, Argenti received approximately $1.1 million in salary from his new company.

*Facts Relating to Statute of Frauds and No–Oral–Modification Issues*

Additional factual analysis is required dealing with MLIF's arguments that the jury finding of breach of contract cannot stand because (1) there was no compliance with New York's Statute of Frauds and (2) the agreement of October 1991 modified certain earlier agreements, which forbade oral modification.

In light of the evidence presented to the jury and the manner in which the issues were posed to the jury, it must be concluded that the jury found that the Argentis, the Company and MLIF entered into an agreement, the terms of which were set forth in the Term Letter and the Deferral Letter, transmitted by Hahn & Hessen on October 29.

The Term Letter is Defendants' Exhibit 1, and the Deferral Letter is Defendants' Exhibit 2. The Term Letter provided that MLIF would advance an additional $1 million to the Company to be used as credit support for the new factor, Congress, in order to enable the Company to receive financing from Congress. The Term Letter specified that a new note and security documents would be executed by the Company. It contained language having the effect of requiring the Argentis to guarantee half of the new advance to the Company—*i.e.*, $500,000. The Term Letter provided for the appointment of a new independent accountant and also provided that, under specified procedures, the Company would hire a new chief financial officer. There was provision for amendment of the Stockholders Agreement of November 10, 1988 to have the board of directors of the Company be made up of two persons nominated by MLIF, two by Argenti and one to become the "New Chairman." Detailed provisions were set forth regarding the selection of the New Chairman. Argenti

would transfer to MLIF 9% of the stock of the Company. MLIF would defer principal and interest payments on all outstanding advances to the Company (commencing with the advances reflected in the note of July 13, 1990). The Company would recommence payments on September 30, 1992 and the final maturity date would be December 31, 1993. Argenti's employment contract would be extended through November 30, 1993 (from November 30, 1991).

The Deferral Letter essentially repeated what was said in the Term Letter about deferral of interest payments on notes given by the Company, and in addition provided for the deferral of interest payments on the notes given by the Argentis, so that such payments would start September 30, 1992. This was a one-year postponement from September 30, 1991.

MLIF points to several prior instruments containing clauses forbidding oral modification, and claims that the alleged October 1991 agreement would have modified all of these instruments. All prior notes given by the Company and the Argentis contained a provision that they were "subject to all of the terms and conditions" of the relevant Loan and Security Agreement or Security Agreement. The Loan and Security Agreement and the Security Agreement (both of which were amended as new advances were made) stated that "[t]his agreement cannot be changed or modified orally." The notes therefore appear to incorporate by reference the clauses prohibiting oral modification. The prior notes were to be modified by the October 1991 agreement in deferring certain principal and interest payments, and the security agreements were to be modified by referring to the new advances of $1 million to the Company and the Argentis' guarantee of half of that amount. The Participation Agreement of July 1990 contained a no-oral-modification clause. It was to be modified by the October 1991 agreement to refer to the new advance. Argenti's original employment agreement contained a clause forbidding oral modification. The October 1991 agreement would extend Argenti's term of employment by two years. The Stockholders Agreement also contained a no-oral-modification clause.

This agreement was to be modified by the October 1991 agreement and provide MLIF with a larger share in the Company and a change in the composition of the board of directors.

The Term Letter and the Deferral Letter were signed by the Company and the Argentis on October 30 but were never signed by MLIF.

MLIF's specific contentions under the Statute of Frauds and the Argentis' response will be discussed later in this opinion. However, with regard to MLIF's no-oral-modification argument, some further factual description is in order at this point.

One argument of the Argentis is that, even if there was no sufficient writing, there was part performance. In this connection, the following facts are relevant.

The Term Letter provides:

7. The Argentis will execute and deliver and additional promissory note to MLIF in the principal sum of $500,000 ("Fifth Additional Promissory Note") to evidence the New Argenti Loan.

8. The New Argenti Loan will be secured by (I) the collateral pledged to MLIF by the Argentis under the Security Agreement dated July 13, 1990, as same has been amended, and (ii) a Mortgage on the real property located at the Conyers Farm Road, Greenwich, Connecticut ("the Mortgage"). The Argentis will execute any documentation to the aforementioned documents as shall be necessary to effectuate the foregoing, including, without limitation, (A) an amendment to the Security Agreement ... and (B) the Mortgage.

The "New Argenti Loan" referred to in paragraph 7 of the Term Letter referred to the $500,000 obligation of the Argentis reflected in the Fifth Additional Promissory Note. This was specified in paragraph 6 of the Term Letter.

The Fifth Additional Promissory Note is Item 1 transmitted with the Hahn & Hessen letter of October 21, and is quite obviously the note referred to in Paragraph 7 of the Term Letter. The amendment to the Securi-

ty Agreement referred to in paragraph 8 of the Term Letter is Item 2 transmitted with the Hahn & Hessen letter. The Mortgage referred to in Paragraph 8 of the Term Letter is Item 3 transmitted with the Hahn & Hessen letter. The Term Letter required, among other things, that the Argentis "will execute" the Fifth Additional Promissory Note, the Amendment to the Security Agreement and the Mortgage. Hahn & Hessen sent these three documents to Argenti for him and his wife to execute. Berman, of Hahn & Hessen, called Argenti on both October 29 and October 30 to make sure that the Argentis executed these documents. The uncontradicted evidence is that the Argentis did, in fact, execute these documents as required by the Term Letter. Argenti returned all these documents to his attorney, Shef, pursuant to the instruction in the Hahn & Hessen letter. Although Argenti and Shef were prepared to deliver these documents at the closing, the closing was called off by MLIF and delivery was thus frustrated. The question of whether the execution of the documents constituted part performance will be addressed later in this opinion.

### Discussion

*Statute of Frauds*

■ MLIF first argues that the provision about performance within one year in the New York Statute of Frauds, New York General Obligations Law § 5–701.a.1, bars the Argentis' contract claim as a matter of law. Prior to its 1994 revision, this provision read:

a. Every agreement, promise, or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by some party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

1. By its terms is not to be performed within one year from the making thereof . . .;

N.Y.Gen.Oblig.Law § 5–701.a.1 (McKinney 1989).

■ New York courts only apply section 5–701.a.1 to agreements which by their terms have absolutely no possibility of being performed within one year. *See North Shore*

*Bottling Co. v. C. Schmidt and Sons, Inc.,* 22 N.Y.2d 171, 175–76, 292 N.Y.S.2d 86, 89–90, 239 N.E.2d 189, 191–92 (1968).

In this case, MLIF contends that the agreement could not be performed within one year for two reasons. First, the Term Letter agreed to extend Patrick Argenti's employment agreement by two years, until November 1993. Second, the Note Deferral Letter agreed to defer various payments on the Company's existing notes from fourteen months to five years. Although it is questionable whether the agreement to extend the employment agreement implicates the Statute of Frauds, the court need not reach that issue. The agreement certainly contemplated deferring some payments under the existing notes to dates as much as five years in the future. Although the Company could theoretically terminate the obligation to pay interest by prepaying the notes within one year, the weight of New York authority is that a termination contingency exercisable only by the party seeking to enforce an agreement is insufficient to remove the agreement from the Statute of Frauds. *See Burke v. Bevona,* 866 F.2d 532, 537 (2d Cir. 1989) (collecting cases); *Americana Petroleum Corp. v. Northville Indus. Corp.,* 200 A.D.2d 646, 606 N.Y.S.2d 906, 907–08 (2d Dep't 1994); *Huebener v. Kenyon & Eckhardt, Inc.,* 142 A.D.2d 185, 534 N.Y.S.2d 952, 955–56 (1st Dep't 1988).

■ The Argentis argue that their agreement with MLIF is severable into two contracts. They ask the court to sever those provisions that, standing alone, would not be barred by the Statute of Frauds.

■ Under New York law, severability rests on the intent of the parties, and is normally a question of fact. *Ming v. Corbin,* 142 N.Y. 334, 340–41, 37 N.E. 105 (1894). In this case, both Argenti and MLIF argued throughout the trial that the agreement, if anything, consisted of all of the terms listed in the Term Letter and Note Deferral Letter. Neither party requested a jury instruction on severability, or argued at trial that the agreement was severable in any respect. Therefore, the court will treat the items list-

ed in the Term Letter and Note Deferral Letter as an integrated agreement.

■ However, the October 29 writings sent to the Argentis constitute a sufficient memorandum of the agreement to satisfy the Statute of Frauds. Those writings included the Term Letter, the Deferral Letter, and the transmittal letter signed by a paralegal at MLIF's law firm. Taken together, the writings precisely describe the alleged agreement and include a signature of an agent of MLIF. That is sufficient to satisfy the Statute of Frauds. *See Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 55–56, 110 N.E.2d 551 (1953).

■ Section 5–701 does not require that the agreement itself be in writing, only "some note or memorandum thereof." N.Y.Gen.Oblig.Law § 5–701(a). This "note or memorandum" may be composed of multiple documents, signed and unsigned, providing: (1) that they refer to the same subject matter or transaction, (2) that together, the documents describe all essential terms of the agreement, and (3) that a document establishing a contractual relationship between the parties bears the signature of the party to be charged or its lawful agent. *Crabtree*, 305 N.Y. at 56, 110 N.E.2d 551. In *Crabtree*, an unsigned agreement and two payroll "change cards" signed by defendant's employees were sufficient to overcome section 5–701 and demonstrate a two-year employment contract. *Id.* at 53–56, 110 N.E.2d 551.

In this case, the Term Letter and Note Deferral Letter contain a complete statement of the parties' agreement. They were transmitted with a letter signed by Denise Riordan, who had been authorized to do so by Linda Berman, MLIF's attorney. Berman had been charged with determining the final wording of the agreement with Shef. *Cf. Allied Sheet Metal Works, Inc. v. Kerby Saunders, Inc.*, 206 A.D.2d 166, 619 N.Y.S.2d 260, 262 (1st Dep't 1994) (holding that signature of vice president, who has "at least apparent authority" to make agreement, was sufficient to satisfy Statute of Frauds). Together, the three documents are sufficient to satisfy the Statute of Frauds. *Crabtree*, 305 N.Y. at 53–56, 110 N.E.2d 551.

*The No–Oral–Modification Issue*

■ MLIF also argues that the Argentis' contract claim is barred by New York General Obligations Law § 15–301, which provides that:

[A] written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the charge is sought or by his agent.

N.Y.Gen.Oblig.Law § 15–301(1) (McKinney 1989).

■ Unlike the New York Statute of Frauds, section 15–301 is not satisfied by a mere note or memorandum of an agreement. *DFI Communications, Inc., v. Greenberg*, 41 N.Y.2d 602, 606, 394 N.Y.S.2d 586, 589, 363 N.E.2d 312, 315 (1977). However, it does not go so far as to require a formal agreement signed by both parties, but may be satisfied by a sufficiently formal writing signed by the party to be charged or his agent. *Id.* at 606–07, 394 N.Y.S.2d at 589–90, 363 N.E.2d at 315–16. Section 15–301 "was intended in part to compensate for the demise of the seal . . . , thus, the statute requires the dignity of a formal writing to insure the validity and genuineness of a contractual modification ." *Id.* In that case the New York Court of Appeals held that the signed minutes of a corporation were a sufficient writing to satisfy section 15–301. In that case, the defendant corporation's board of directors agreed to modify the plaintiff's employment agreement at a board meeting. That agreement was recorded in the minutes of the meeting, and the minutes were signed by the corporate secretary.

In contrast, in *Bakhshandeh v. American Cyanamid Co.*, 185 N.Y.S.2d 635, 637, 8 A.D.2d 35, 37 (1st Dep't 1959), *aff'd*, 8 N.Y.2d 981, 204 N.Y.S.2d 881, 169 N.E.2d 188 (1960), the court rejected a less formal writing, proffered in an attempt to satisfy section 15–301. In *Bakhshandeh*, the plaintiff attempted to demonstrate an oral modification of his employment agreement through an unsigned memorandum by his employer setting out the terms of his new agreement and two signed

letters from his employer to third parties referring to the new agreement. The court ruled that these documents failed as a matter of law to comply with the requirements of section 15–301's predecessor statute.

The question in the present case is whether the Term Letter, the Deferral Letter and the transmittal letter rose to the level of formality required by the statute and by the cases, particularly *Greenberg*. The question is a close one, but the court holds that they do not.

■ However, under New York law, partial performance of an oral modification validates a contract otherwise barred by no-oral-modification provisions and by section 15–301(1). That performance must be "unequivocally referable" to the new contract. *Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 343, 397 N.Y.S.2d 922, 926, 366 N.E.2d 1279 (1977). In other words, a party seeking to avoid the no oral modification statute must demonstrate actions that are " 'unintelligible or at least extraordinary,' explainable only with reference to the oral agreement." *Anostario v. Vicinanzo*, 59 N.Y.2d 662, 664, 463 N.Y.S.2d 409, 410, 450 N.E.2d 215, 216 (1983).

■ Whether partial performance is unequivocally referable to the new contract is a question of fact. However, where it is necessary to determine whether the issue is for the jury or for the court, the ordinary rules apply. Where it is clear beyond any question that the partial performance was unequivocally referable to the new contract, the question need not be submitted to the jury and the court will decide. *See, e.g., Evergreen Marine Corp. v. Welgrow Int'l Inc.*, 942 F.Supp. 201, 208–09 (S.D.N.Y.1996); *Maynard Court Owners Corp. v. Rentoulis*, 235 A.D.2d 867, 652 N.Y.S.2d 664, 666 (3d Dep't 1997).

■ The Argentis argue that when MLIF requested that the Company not make the interest payments due on September 30, 1991, and when the Company refrained from making these interest payments, these were actions constituting part performance of the new agreement, which provided for the deferral of interest payments. Indeed, the uncontradicted evidence is that the deferral of interest payments was requested by Congress, and that the deferral of the September 30, 1991 payments was the first step to be taken in that regard. However, the evidence is clear that the agreement in all its terms had not been arrived at as of the time of the request not to pay the September interest. Thus, this cannot be said to be part performance referable to the agreement in question.

■ However, the Argentis properly rely upon the execution of the documents sent by Hahn & Hessen on October 29 as being part performance of the new agreement. The jury has found, based upon ample evidence, that an agreement was in fact entered into, and the jury verdict means inevitably that the Term Letter and the Deferral Letter stated the terms of that agreement. The Term Letter and the Deferral Letter were two of the documents sent with the October 29 Hahn & Hessen letter. The agreement was clearly in effect as of the time the Hahn & Hessen letter was sent. As described earlier in detail, three of the documents sent with the Hahn & Hessen letter were instruments which the Argentis were required to execute under the terms specified in the Term Letter. The Argentis were requested to execute these three instruments. The instruments—the new note, and the amendments to the Security Agreement and the Mortgage Deed—were at the very heart of the carrying out of the new agreement. In connection with the five prior advances, these were the essential documents which had been used to impose the guarantee obligations on the Argentis. The court concludes that the execution of these instruments constituted part performance of the new agreement. The matter is clear beyond question and is appropriately decided by the court, not the jury.

Moreover, it is equally clear that the execution of the instruments was unequivocally referable to the new agreement. If the jury had found no agreement, then there could, of course, have been no part performance of the agreement. But the jury did find that there was an agreement. Moreover, in view of the evidence and the manner in which the issue was presented to the jury, the jury's verdict

can only reasonably be interpreted to mean that the terms of the agreement were those set forth in the Term Letter and the Deferral Letter. The three instruments—the new note and the amendments to the Security Agreement and the Mortgage Deed—were sent to the Argentis for execution along with the Term Letter and the Deferral Letter. It is impossible to imagine that the execution of these instruments was done for any other purpose than to carry out the terms of the agreement.

The court has noted earlier the various specific prior instruments containing no-oral-modification clauses, and the ways in which they were to be modified by the October 1991 agreement. In connection with the part performance issue, there was no literal part performance of each modification of each prior instrument. For instance, there was no part performance of the modification to the schedules of principal and interest payments. However, such a thing is not required. In the present case, MLIF admits, and indeed contends, that the various elements of the October 31 agreement (which it says was merely a proposed agreement) must be considered as one integrated whole—*i.e.*, one agreement, not as a series of separate agreements. Indeed, this is surely the proper interpretation. It must necessarily follow that part performance of certain obligations under the agreement constituted part performance of the *entire* agreement.

*Credibility Issues*

An unfortunate feature of the trial was the aggravated problems about the credibility of MLIF's evidence. This merits some extended discussion because it relates to the question of whether the jury's verdict was supported by the evidence. Also, this matter cannot be ignored in dealing with the issues arising under the Statute of Frauds and under the no-oral-modification clauses and the statute dealing with such clauses.

It is safe to say that the dispositive factual issue in the case related to the events of October 29–30, and, indeed, mainly relating to the one day, October 30. Argenti testified that at the meeting with Congress on October 29 and the subsequent meeting with MLIF after the Congress representatives left, he was assured that the new agreement was set to close on October 31. Argenti testified that he called MLIF on October 30 merely to apologize for the previous day's flare-up with Tully, and that the apology was accepted with remarks to the effect that the parties would meet again at the closing. Argenti testified that he heard nothing further until he was called the next day shortly before the scheduled closing and told that there would be no such closing.

The MLIF witnesses testified to a radically different version of the events. They testified that, following the meeting with Congress, there were telephone conversations on October 30 (perhaps starting late October 29), in which Argenti was questioned closely about his Company's financial projections and was plainly told that there were problems which prevented MLIF from finally committing itself. The MLIF witnesses also testified that they spoke to Congress on October 30 and received certain negative information which was passed on to Argenti. Thus, according to MLIF, there was no manifestation by MLIF that an agreement had been reached, and the refusal to close was simply the termination of negotiations.

In viewing these issues, it is necessary to start with the fact that in October 1991 the Company was providing MLIF and Congress with projections of its borrowing needs, week by week starting with the end of October 1991 and going into February 1992. For each week there were figures showing the amount of borrowing that could be made against accounts receivable and against inventory under the formula established by Congress. Then there were figures showing the cash needs of the Company as of that date and the amount of borrowing which would be needed to meet those cash needs, which would be in excess of what was permitted against accounts receivable and inventory. Under the arrangement contemplated by Congress, such excess borrowing could be made against the cash collateral which would be $7.5 million. However, Congress required that $1 million of that be reserved, so that additional borrowing against the cash collateral was intended to be limited to $6.5 million.

The week-by-week projections provided by the Company to MLIF and Congress had detailed set of figures, concluding for each week with a figure of the borrowing needs of the Company for that week over and above what could be borrowed against accounts receivable and inventory. If this concluding figure was $6.5 million or less, the Company was "within formula." If the figure was more than $6.5 million, the Company was "out of formula," meaning that its cash needs as of that week were more than could be borrowed under the literal terms of the Company's arrangement with Congress.

These projections were regarded by all concerned as highly important. During the month of October the Company kept refining the projections, to some extent in consultation with MLIF and Congress. For instance, a set of projections was circulated by the Company on October 28; another set with certain adjustments on October 29.

Harvey Appelle was a crucial witness from MLIF as to the events of October 29–30. He testified that he and Tully spoke to Argenti on the telephone on October 30, and that Argenti was joined in the conversation by the Company's inside accountant, Cosentino. Appelle indicated that he may have spoken to Argenti and Cosentino late on October 29 to initiate the discussion. However, according to Appelle, the important discussion took place on October 30. He testified that he and Tully were questioning Argenti and Cosentino closely about what assumptions were used as a basis for the projections. In other words, there were questions about the amount and timing of sales, the amount and timing of the delivery of merchandise, what letters of credit would be opened and when, and so forth. Appelle testified that the information obtained was something that needed to be put down in writing rather than relying simply on memory, and he stated that Tully was making notes. He further testified that after the conversation or conversations with Argenti and Cosentino, Tully went into his office to "crunch the numbers." Then Tully came back to Appelle and showed Appelle that at some point, contrary to what was indicated in the projections, the Company would be out of formula to the extent of $900,000. Appelle recalled seeing some written analysis by Tully showing the figure $900,000 or $7.4 million. However, according to Appelle, the notes taken by Tully from the telephone discussion, and the written analysis by Tully shown to Appelle after Tully crunched the numbers, no longer exist.

Appelle cannot recall when it was that the Company was to be out of formula by the $900,000, or how long that condition would exist. Appelle has stated that, according to Tully, the Company would get back within formula, but Appelle cannot recall what the date was when that was supposed to occur.

The projections which were, according to Appelle's testimony, being closely scrutinized by Appelle and Tully and which were the subject of intense questioning directed to Argenti and Cosentino, were in evidence at the trial. However, MLIF's attorney, in eliciting testimony from Appelle, did not once show Appelle any of the projections, nor did he ask Appelle any question about what specific figures, or even what types of figures in these projections were the subject of questioning or comment in the telephone discussions, or were the subject of revision in connection with the Tully analysis.

Tully also testified about these events. He stated that in the telephone conversations on October 30 MLIF's representatives were Appelle and himself, and also Blumberg. Argenti was on the other end, and perhaps Cosentino. Tully was rather vague about the October 30 conversation, and spoke generally about conversations in October involving inquiries about production and delivery of merchandise for the Company, the degree of demand for the goods, and so forth. He did not testify that he made any notes, and he specifically denied going off to crunch numbers, and further deny making any written analysis. He was not asked to confirm the $900,000 figure or the $7.4 million testified to earlier by Appelle, and he gave no testimony about arriving at any specific figures at all. As in the case of Appelle, the MLIF attorney did not ask Tully any questions whatever about the actual projections which were in evidence in the case.

To return to Appelle, it was his testimony that after Tully had made his analysis, con-

cluding that there would come a time when the Company would be $900,000 out of formula, he and Tully called Schwartz of Congress. He said that this occurred on October 30. However, Appelle "didn't not want to scare off Schwartz" (Tr. 1591). According to Appelle, they simply told Schwartz that the Company had some seasonality, more of a need at "mid-month than at other times," and might be "slightly out of compliance, or may be significantly out of compliance" although the Company can "come back in and I think we can prove that to you" (Tr. 1456). According to Appelle, nothing was said about the fact that the projections had been recalculated to show the $900,000 discrepancy at some point. MLIF wanted to obtain from Schwartz the assurance that there would be flexibility by Congress in granting credit to the Company. According to Appelle, however, Schwartz's response was that Congress would not "go a nickel over the collateral base" in supporting the Company (Tr. 1456).

Tully testified that he participated in the telephone call to Schwartz, and that Schwartz was told that the projections did not show the Company's ability to live within the constraints of the collateral limits. According to Tully, Schwartz was asked whether there might be mid-month flexibility where the Company was in compliance at the end of the month. According to Tully, Schwartz responded that "at no time would they go one dollar over the agreed-to credit constraints or limits" (Tr.1944).

This testimony is in stark contrast to that of Schwartz. He testified that he did not recall any such telephone call from MLIF. When he departed from the meeting on October 29 he expected to close on the 31st, and nothing occurred which cast doubt on that expectation until he was notified on the 31st that there would be no closing.

Moreover, it was clear from Schwartz's testimony that, if there *had been* a discussion with him about the projections and about possible flexibility, he would not have stated that there was not a nickel leeway, or a dollar leeway. He was shown a set of projections issued by the Company on October 29. They projected that the Company would be out of formula by $175,000 for the week ending December 13, by $71,000 for the week ending December 20, by $1,000 for the week ending January 3, and by $159,000 for the week ending January 10. Schwartz was asked about these overages. There was another week, ending January 17, when it was projected that the Company would be out of formula by $243,000. Schwartz was not actually asked about that. However, he was asked whether the overages for the four weeks pointed out to him were considered to be significant enough for the new factoring arrangement not to go forward. He answered that this apparently was not the case because Congress had indeed agreed to close even with these projections in hand. He explained that there was still $1 million of "excess availability" over and above the $6.5 million. He further testified that it was doubtful that overages of this kind would cause a problem if the Company came back within formula within a short time, as was indeed projected. He did, however, say that if the Company went out of formula to the extent of $500,000–$700,000 or $1 million, this would be a problem, and the Company would have to raise additional cash from some source other than Congress.

The inevitable conclusion from all this is that there is the most serious doubt, to say the least, about whether any such conversation took place. The conversation would have been an important one, at an important juncture. It is most unlikely that the conversation took place and Schwartz totally forgot about it. In any event, in light of Schwartz's trial testimony, there is no basis for believing that Schwartz told MLIF that there was not a nickel or a dollar flexibility. Moreover, Schwartz would surely have regarded any information about the Company going out of formula to the extent of $900,000 as a serious matter. But according to Appelle, although this information had been generated, but was not disclosed to Schwartz.

As described earlier, Tully testified that Blumberg participated in the telephone calls to both Argenti and Schwartz on October 30. Blumberg testified that he recalls no telephone calls to Argenti or Schwartz on October 30.

MLIF called an expert witness and showed him the projections. He testified,

among other things, that the projections were flawed and could not be relied upon in view of the financial history of the Company and the other financial information which had previously been provided by the Company. However, at the time of the transaction in question, those at MLIF were surely capable of analyzing financial documents, including projections; they knew the financial history of the Company; they were acquainted with previous reports of the Company. Yet, when they testified at the trial, they were not asked to analyze the projections, nor were they even shown the projections and asked how they analyzed them in 1991, something far different from theoretical testimony by an outsider in 1996.

Another illustration of the credibility problem affecting MLIF arose in connection with an internal MLIF memorandum dated October 15, 1991 analyzing the proposed arrangement with Argenti, Inc. Two copies of this memorandum were produced in discovery. In both copies page 4 of the 6 pages is missing. This was an important page of an important memorandum. It is difficult to believe that its disappearance was the result of a mere accident.

What has been described here illustrates the problem with MLIF's credibility in this lawsuit. There were other problems, but enough has been said for present purposes. However, it should be noted that on numerous occasions during the trial, the court expressed (out of the presence of the jury, of course) its view of the difficulty. *See* Tr. 1274–1275, 1565–1567, 1662–1667, 1904–1906, 1990, 2001, 2002, 2352, 2676–2677 and 3105–3106.

In concluding this segment of the opinion, the court returns to the issues regarding the Statute of Frauds and the statute enforcing no-oral-modification clauses. Or course, the legal standards governing the application of those statutes must be strictly adhered to. However, the court should never lose sight of statutory purpose. The obvious purpose of both of the statutes is to minimize the risk of a plaintiff coming into court and fraudulently concocting a story of an oral contract.

The court's hearing of the evidence in this case and observation of the witnesses, to-gether with an analysis of the documents, leads the court to the conclusion that it is the Argentis, not MLIF, who have come to court with evidence which attempted to present what really occurred.

*Ruling on Motion Regarding Contract Issues*

For the reasons set forth above, the court denies MLIF's motion for judgment as a matter of law setting aside the jury's verdict on the contract issue. The court holds that there was a sufficient writing to satisfy General Obligations Law § 5–701.a.1. The court further holds that there was sufficient part performance to exempt the October 1991 agreement from the bar of the no-oral-modification clauses and General Obligations Law § 15–301.

As to Section 5–701.a.1, the court rules alternatively that there was sufficient part performance to exempt the agreement from the bar of that statute, even if there was no sufficient writing.

The court further denies MLIF's motion for judgment as a matter of law on the contract issue because of insufficient evidence. There was ample evidence justifying the jury's finding.

The court further denies MLIF's alternate motion for a new trial based on alleged improper jury instructions. The court has considered the arguments and find them to be without merit.

*Fiduciary Duty*

 At the trial, the court submitted an issue to the jury about whether MLIF had breached a fiduciary duty. The court expressed doubt at the time as to the legal validity of any such claim, but submitted the issue to the jury in order to have the matter covered at the trial so as to minimize the risk of remand and new trial on that issue.

The court instructed the jury that MLIF had a limited fiduciary duty, as a co-owner of a small corporation, to treat Argenti honestly and fairly, which would be violated by planning some move detrimental to Argenti and the Company while concealing it. The jury found that the fiduciary duty defined by the court was breached.

The problem is that there is no realistic basis for finding that the misconduct by

MLIF went beyond breach of contract. The jury was certainly justified in finding that MLIF was engaged in some considerations and planning which it was concealing from Argenti and which it has concealed from the court and the jury. But all that can be reasonably inferred about this is that MLIF was attempting to avoid performing the contract and being liable on the contract. The jury could certainly find that Argenti was misled by this conduct. However, his remedy is to avail himself of the rule of law that a contract is created by objective manifestations, despite what is going on privately in the minds of those making those manifestations. On this basis there is a valid claim for breach of contract. The court believes that the evidence and the law do not justify going beyond this and finding a breach of fiduciary duty.

The court therefore grants MLIF's application for judgment as a matter of law setting aside the jury's verdict finding a breach of fiduciary duty.

*Damages*

The principal damage claim by the Argentis was that the failure of MLIF to go through with the contract resulted in the destruction of the Company's business, resulting, in turn, in the Company's accelerated liability on its notes and the liability of the Argentis on the notes they gave by way of guarantee. This was a perfectly valid theory of damages. However, in the course of the presentation of the evidence about damages and the argument on the subject, it became apparent that there was an issue about the exact degree to which the jury could find, by a preponderance of the evidence, that the performance of the contract would have indeed prevented MLIF from calling the Argentis on their guarantees. The details of all this are contained in the record and will not be fully described here.

In any event, in view of the circumstances, the first question about damages was submitted to the jury in the form described earlier in this opinion. The court has considered MLIF's argument as to the incorrectness of this interrogatory to the jury, and finds it to be without merit.

As to the issue about compensation, the jury was allowed to consider Argenti's earnings at his newly formed company as mitigation of damages, and quite obviously did so. The jury also was allowed to consider whether Argenti's receipts from the sale of stock in his new company should operate as mitigation. It is evident that they did not find that proceeds from a stock sale mitigated damages resulting from loss of compensation. This was a finding the jury was entitled to make.

*The Judgment*

The court reviewed the arguments of MLIF regarding the judgment prior to its entry and has considered them again. The court believes that they are without merit.

### Conclusion

On its post-trial motion, MLIF is granted judgment as a matter of law setting aside the jury verdicts regarding breach of fiduciary duty. In all other respects MLIF's post-trial motion is denied.

SO ORDERED.