PG 1044 MADISON ASSOCIATES, L.L.C., Plaintiff,

v.

SIRENE ONE, L.L.C., et al., Defendants.

No. 02 Civ. 5293RLE.

United States District Court, S.D. New York.

May 13, 2005.

Brian K. Bernstein, Horwitz, Toback & Hyman, New York City, for Plaintiff.

**OPINION & ORDER**

ELLIS, United States Magistrate Judge.

Plaintiff PG 1044 Madison Associates, LLC ("PG 1044") brings this property action in diversity against defendants Sirene One, LLC ("Sirene One") and its sole officer, Karen Wu. Defendants, in turn, seek indemnification from third-party defendant Jeanette Wei. The Court conducted a two-day bench trial on November 19, 2003, and the parties submitted post-trial briefs in December 2003 and January 2004. For the reasons discussed below, plaintiff's claims for conversion, property damage, and attorney's fees are **GRANTED**, and the Court awards $2,500, $22,800, and $25,000, respectively, on those claims. Plaintiff's holdover claim is **DENIED**. Defendant's claim against third-party defendant Jeanette Wei is **DENIED**.

## I. BACKGROUND

On April 1, 1997, Paul Green ("Green"), predecessor in interest to PG 1044, entered into a ten-year agreement for de Nails, LLC, to rent the second floor of 1044 Madison Avenue in Manhattan (the "Premises"). Trial transcript ("Tr.") at 9; Plaintiff's Trial Exhibit ("PX") 1 (Lease Agreement, dated April 1, 1997, hereinafter also referred to as "Lease"). The Lease included an exhibit listing certain salon-related items. According to the Lease:

> Upon the expiration or other termination of the term of this Lease, Tenant shall quit and surrender to Owner the demised premises, broom clean, in good order and condition except fixtures listed on Exhibit 1.

PX 1 at ¶ 22. The Lease also provided that:

> In addition to the payment of rent and additional rent provided for in this Lease, Tenant shall pay the Landlord at the signing of Lease the sum of Fifty Thousand Dollars ($50,000) in consideration of the right to use during the term of this Lease equipment as per the list of equipment attached as Exhibit 1.

*Id.* The Lease set the base monthly rental as $8,333 for the first three years, $9,167 for the following four years, and $10,083 until March 31, 2007. *Id.* The Lease was amended on June 30, 1998, to name Sirene One as the tenant, and included a limited guaranty establishing Karen Wu ("Wu") as guarantor for Sirene One. Tr. at 11, 29–30; PX 2. In relevant part, Wu guaranteed to Green

> the full payment, performance and observance of all agreements to be performed and observed by Tenant in the attached lease, including the "Rules and Regulations" as therein provided, and including the payment of any of Land-

lord's legal expenses pertaining to Landlord's legal actions against Tenant. PX 2. On January 4, 1999, Green deeded the building in which the Premises are located to PG 1044.

Sirene One opened a beauty salon at 1044 Madison Avenue named "Karen Wu: Beauty and Wellness Spa." In 2001, Siren One failed to make a number of rental payments. Tr. at 12–13. After making several verbal and written demands, PG 1044 commenced eviction proceedings. Tr. at 12, 15. The parties entered into a stipulation of settlement in December 2001, in which Sirene One agreed to surrender the property by December 31, 2001, and pay a sum of $44,068.61, which represented its past rent, additional rent, and fees owed. Tr. 13, 70–73; PX 3 (Stipulation of Settlement, hereinafter also referred to as "Stipulation") at ¶ 5. The Stipulation outlined a schedule for four equal payments, due monthly from January 15 to April 15, 2002. Tr. 29, 63, 65–66; PX 3 at ¶ 5. If Sirene One defaulted on any of the required payments, the Stipulation provided that PG 1044 "shall enter a judgment for $44,068.61 less any payments made on account, and have immediate execution therefor." Stipulation at ¶ 5. If Sirene One failed to surrender the property by December 31, 2001, the Stipulation required Sirene One to pay damages in the amount of four times the base rent. Tr. at 16; PX 3 at ¶ 14. The Stipulation indicated that "TIME IS OF THE ESSENCE," Tr. at 63; PX 3 at ¶ 7, that Sirene One agreed to not seek any extensions of time, *id.*, and that "no subsequent alteration, supplementation, modification, amendment, change or addition to [the] agreement shall be binding upon [the parties] unless in writing and signed by each of [the parties]." *Id.* at ¶ 18. Finally, it stated that if Wu made "the payments required, and otherwise complie[d] with the Limited Guaranty ... [the Lease]

shall be deemed terminated ... and Wu shall be relieved of any and all liability as guarantor." *Id.* at ¶ 5.

In a complaint dated May 20, 2002, PG 1044 filed suit in New York state court alleging that Sirene One violated the terms of the Stipulation by: 1) failing to surrender the Premises by December 31, 2001; 2) removing the fixtures itemized in Exhibit 1 of the Lease and causing damage to the Premises; and 3) converting the Exhibit 1 fixtures. Defendants removed the case to this Court, and denied all allegations except that they had failed to pay use and occupancy fees for January 2001. They added an affirmative defense that Karen Wu was released from her guarantor obligation because she had performed as directed by the Stipulation. Defendants added Jeannette Wei ("Wei") as a third-party defendant. They alleged that Wei had entered into a contract to purchase certain items from Sirene One at 1044 Madison Avenue, but that she had stolen additional property from the Premises and caused the damages for which the plaintiff had sued defendants. In her answer to the third-party complaint, Wei asserted, among other things, that: (1) the Court lacked jurisdiction over her since both she and plaintiff were residents of New York; (2) there was no privity of contract between the parties; (3) that any damages were caused by actions of the plaintiffs or defendants; and (4) that Wei acted within any contract that did exist.

## II. DISCUSSION

### A. Holdover by Defendant Sirene One

PG 1044 asserts that Sirene One did not surrender the Premises on December 31, 2001, as required by the Stipulation. Plaintiff's Post–Trial Memorandum of Law ("Pl.Mem.") at 4. As a result, it evicted Sirene One and took possession on Janu-

ary 30, 2002. *Id;* Tr. at 18, 20. Sirene One admits that it stayed five days past December 31, 2001, in order to store equipment to be sold to Wei. Post–Trial Brief of Defendants Sirene One and Karen Wu ("Def.Mem.") at 9–10. It claims, however, that Roger Levitt, an advisor to Wu, called the offices of Judson Realty, the rental agent, and received permission from Maria Giannasca ("Giannasca"), Judson Realty's Director of Management, to store their equipment at the Premises. *Id.* at 9. Defendants' attorney for the Stipulation, Michael Nachtome, testified that he also called Giannasca, and confirmed permission for defendants to have a few days in January 2002 to vacate the space. *Id.* Finally, Siren One asserts that, even if the Stipulation had been breached, the holdover fine is an unreasonable penalty, especially because Edward William Judson ("Judson"), managing member of Judson Realty, claimed at trial that he suffered no out-of-pocket damages as a result of the minimal holdover. *Id.* at 11–12.

Giannasca testified that she refused to extend Sirene One's occupancy, and that she had no authority to extend the Lease. Tr. at 61–62, 68. PG 1044 argues that, in any case, the Stipulation required that any changes to its terms be in writing. Pl. Mem. at 7–8; Plaintiff's Post–Trial Reply Memorandum of Law ("Pl. Reply Mem.") at 2–5. Finally, PG 1044 submits that the holdover provision is not an illegal penalty because it was part of a settlement agreement entered into by both parties. *Id.* at 9–10.

### 1. Did Giannasca Give Oral Permission to Stay Over?

The testimony of Levitt and Nachtome consistently demonstrate that Giannasca gave oral permission to stay over. Levitt, for example, said that he called Giannasca, with Wu listening in, to let her know they were ready to give plaintiff the keys, but would like to store some equipment at the Premises until early January. Tr. at 158. He claimed that Giannasca said "absolutely, I need to check with my people, something like that, but she said it wouldn't be a problem, it would be fine, good." Tr. at 158–59. Levitt did not receive any further phone calls from Giannasca. Tr. at 159. Nachtome testified that Giannasca told him that it "would be fine, OK" to store the remaining items in the space. Tr. at 117.

In contrast, evidence from Giannasca regarding the stay-over is inconsistent. At her deposition, she denied having spoken to anyone concerning a holdover for a few days in January 2002. Tr. at 67–68. At trial, however, she was not so definite, and merely said she told them that she "would have to speak to Mr. Judson and get back to them," Tr. at 61, although she later insisted that she had said "absolutely not" to defendants' request for an extension of the lease term. Tr. at 62. Judson testified that he did not remember if he received any calls from the tenant seeking to stay over, that they would not grant any extensions to a tenant involved in litigation, and that "Miss Maria Giannasca would take those calls in any event." Tr. at 15.

The Court finds that defendants are more credible than Giannasca. The Court credits the testimony of Levitt and Nachtome that they discussed the holdovers with Giannasca and she gave oral permission. Not only was Giannasca's trial testimony inconsistent with her deposition, but she appeared uncertain of the details of the crucial conversations. In contrast, defendants had more incentive to pay particular attention to the subject matter. Finally, plaintiff has not clearly demonstrated that Giannasca lacked the authority to grant such permission. Based on

her own testimony, she had apparent authority to grant the request.

### 2. Should the Oral Modification be Given Effect?

██ New York General Obligation Law § 15–301 requires that written agreements that prohibit oral modifications be changed by written executory agreements. Defendants argue, however, that equitable estoppel provides an exception to this rule. Def. Mem. at 10 (*citing Latham Four Partnership v. SSI Medical Services, Inc.*, 182 A.D.2d 880, 581 N.Y.S.2d 891 (3d Dep't 1992)); *see also Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 344, 397 N.Y.S.2d 922, 366 N.E.2d 1279 (1977). As the Court of Appeals noted in *Rose*, "once a party to a written agreement has induced another's significant and substantial reliance upon an oral modification, [that] party may be estopped from invoking the statute to bar proof of [the] oral modification." 42 N.Y.2d at 344, 397 N.Y.S.2d 922, 366 N.E.2d 1279. The trial evidence indicates that defendants sought and received oral permission from Giannasca, which they relied upon when leaving materials at 1044 Madison Avenue. Having given such permission, the defendants should not be permitted to unfairly benefit from a short stay-over. Therefore, the Court finds that equitable estoppel applies. As a result, PG 1044's holdover claim fails and they are entitled to no damages on this basis. The Court does not reach the question of whether the holdover fine provision was an unenforceable penalty.

### B. Conversion of the Exhibit 1 Fixtures

PG 1044 asserts a claim of conversion, which requires that it demonstrate: 1) legal ownership or an immediate superior right of possession to the fixtures; and 2) that defendants exercise unauthorized dominion over the fixtures, to the exclusion of PG 1044's rights. Pl. Mem. at 10 (*citing AMF Inc. v. Algo Distributors, Ltd.* 48 A.D.2d 352, 369 N.Y.S.2d 460 (2d Dep't 1975)). It maintains that paragraph 65 of the Lease states that the items listed on Exhibit 1 were to be used only during the term of the Lease and were to be returned to the landlord, but Karen Wu discarded them. *Id.;* Tr. at 86–87, 123.

Defendants argue, however, that paragraph 22 of the Lease exempts the fixtures from any requirement that they be surrendered. They assert that paragraphs 22 and 65 can be reconciled if paragraph 65 establishes a rental fee for the equipment, and paragraph 22 means that there was no need to return the equipment at the end of the Lease. They point out that this was "hardly surprising given the wear and tear that would be expected." Def. Mem. at 6.

The Court agrees that there are two possible interpretations of the clause "quit and surrender to Owner the demised Premises, broom clean, in good order and condition *except fixtures listed on Exhibit 1*" (emphasis added). First, it can mean that the fixtures were exempt from the requirement to "quit and surrender." Alternatively, it can mean that the phrase "broom clean, in good order and condition" does not apply to the fixtures. Under the first interpretation, the Exhibit 1 items did not have to be returned to the landlord. Under the second, they had to be returned, but they did not have to be returned in good working order. In the latter case, PG 1044 would not be entitled to possession of the fixtures until after completion of the ten year Lease term, but would retain its ownership interest.

██ While it is possible to make these arguments, defendants have failed to show that PG 1044's interpretation is strained or somehow unreasonable. While there would likely be some wear on the items, it

does not follow that they need not be returned. Indeed, if PG 1044 did not intend to retain a proprietary interest, it would have been simple to have a direct sale rather than a lease with no reversionary interest. The Lease did not give Wu the right to give the fixtures away. Accordingly, the Court finds that Wu is liable for conversion of PG 1044's Exhibit 1 fixtures. Because she has given the fixtures away, return is not an available remedy, and damages must be assessed.

### 1. Measurement of Damages for Converted Exhibit 1 Fixtures.

▉ The appropriate measure of damages is the value of the property at the time and place that the conversion occurred. *Kranz v. Town of Tusten,* 236 A.D.2d 675, 653 N.Y.S.2d 194 (3d Dep't 1997). PG 1044 claims $50,000 in damages for the Exhibit 1 fixtures. Pl. Mem. at 10–13. The Court finds this amount to be impermissibly high for the particular items converted. Judson testified that he paid $50,000 for the fixtures and then leased them to Wu for $50,000. Tr. at 10–11, 86, 40; *see also* Lease at ¶ 65. Here, however, PG 1044 was not entitled to the return of the fixtures until the end of the lease. Although the fixtures should have been returned once Siren One and Wu vacated the Premises, the conversion value is not the April 1997 purchase price. That value must be decreased by the fixtures' estimated amount of depreciation after ten years of wear and tear. *See PPX Enterprises, Inc. v. Fredericks,* 94 F.Supp.2d 477, 482, 484–85 (S.D.N.Y.2000); *Ashare v. Mirkin, Barre, Saltzstein & Gordon, P.C.,* 106 Misc.2d 866, 869, 435 N.Y.S.2d 438 (1980). Neither plaintiff nor defendants have offered evidence on the current value of the fixtures based on their value at the end of the lease. Furthermore, plaintiff indirectly conceded that the fixtures had little value because it urged the Court to use a

remedy that only applies "where the property has no recognized used or market value." Pl. Reply Mem. at 6. In the absence of specific testimony in this case, the Court finds that the fixtures would have limited commercial value and awards plaintiff 5% of the original value, that is, $2,500.

### C. Property Damage From the Removal of Trade Fixtures Sold to Wei

### 1. Extent of Damages

PG 1044 asserts claims for damages to the property because of the removal of trade fixtures from the Premises. Pl. Mem. at 13–18; Pl. Reply Mem. at 7–10. Both the Lease and the Stipulation included provisions requiring that defendants surrender the Premises broom clean, and in good order and condition. PX 1 at ¶ 22; PX 3 at ¶ 13. Plaintiff characterizes the damage as "destruction and demolition," including the removal of "high hat" spotlights from the ceilings; pulled out, cut or removed electrical cables, wires, and electrical sockets; holes cut into the sheet rock and dry wall; removed glass walls and partitions, doors, and portions of the air conditioner and ventilation systems; a missing light switch; debris and litter on the floor; and removal of a small section of the granite floor. Tr. at 18–19, 21–22, 24–25, 31, 59–60; Pl. Mem. at 13–14.

Defendants concede that there is some damage to the Premises, but not as extensive as claimed, and defendants assert that third-party defendant Jeannette Wei ("Wei") caused it. Tr. at 18–19, 21–22, 59–60; Def. Mem. at 2, 5, 13–15. Defendants say they sold trade equipment to Wei for $50,000, but Wei "took several things that had not been sold to her, namely ceiling light fixtures (removed with damage to the ceiling), air conditioning registers (removed without damage to the ceiling), a light switch (removed without damage),

the front glass door, and a glass interior partition wall." Tr. at 18–19, 21–22, 59–60; Def. Mem. at 2, 5, 13–15. Defendants contend that Wei damaged the Premises while removing the equipment.

At trial, PG 1044 produced photographs of the Premises before the damage, PX 6, and pictures taken of the damage itself. PX 7. Defendants concede that there is considerable damage, but they challenge the use of the word "destroyed." Def. Mem. at 2, 5, 13–15. The photographs do show substantial damage to the Premises, and certainly indicate that the Premises were left far from "broom clean." Taking as true defendants' admissions regarding damages, it further appears that virtually everything but the windows, walls, floors, and perhaps internal structural systems, were removed. PX 7. Defendants were entitled to remove their trade fixtures and Exhibit 1 items, but further items were removed, with significant damage. PG 1044 has succeeded in demonstrating that their Premises were damaged.

### 2. Amount of Damages

■ New York law provides that the measure of damages to property is the lesser of the diminished market value or the cost to repair. *See Fisher v. Qualico Contracting Corp.*, 98 N.Y.2d 534, 749 N.Y.S.2d 467, 779 N.E.2d 178 (2002). Defendants argue that PG 1044 has neither established the diminished market value or the cost to repair. Def. Mem. at 16.

PG 1044 has asserted that defendants violated the Lease's express obligation that the Premises be left in a state of good repair. Pl. Mem. at 14; *Akron Meats, Inc. v. 1418 Kitchens, Inc.*, 160 A.D.2d 242, 553 N.Y.S.2d 355 (1st Dep't 1990). PG 1044 seeks two components of damages: 1)

loss of rental income; and 2) cost of repair. Pl. Mem. at 13–18. Judson testified that, under normal circumstances, he would have expected to obtain $85 per square foot, or $12,500 [1] per month on the 2000-foot Premises, and to grant a three-month rent abatement. Tr. at 27–29, 36–37, 41–42. He claims that defendants' conduct forced him to let at $75 per square foot, with a five-month abatement. Tr. at 36–37, 41–42. He testified that in July 2001, before there was any damage to the Premises, plaintiff unsuccessfully attempted to lease the Premises for one hundred and seventy-five thousand dollars ($175,000). Tr. at 26, 41–43. Instead, the tenant after Sirene One paid $150,000 per year. PG 1044, therefore, claims a net loss of $200,000 in rent over the term of the new lease. In addition, because PG 1044 had to offer a five-month abatement instead of three, it claims $25,000 in additional rent abatements, for a total of $225,000 in damages. Tr. at 28. On the alternate measure of damages, Judson testified that the cost to restore the Premises would be $150,000. Tr. at 37, 54–55, 124–25.

Defendants point out that Judson's valuation of the diminished market value was based on his *asking* price, and not a true market price. Def. Mem. at 16–17. They also argue that the lease of the subsequent tenant does not include pertinent information, such as what concessions were allowed, and plaintiff did not factor in the decline in market value that would have affected properties located near the site of the former World Trade Center. Def. Mem. at 16–19. With respect to repair, defendants assert that the cost of repair, as established by their expert, Fatimir Alosivic, is approximately sixty-three hundred dollars ($6,300) if plaintiff had to

---

1. At $85 per square foot, a 2000 square foot space would rent for $17,000 per month. It is unclear whether the discrepancy results from incorrect data or some other error, but these numbers do not affect the Court's calculation of damages.

replace the thirteen lights that Alesovic contends were missing, or seventy-six hundred dollars ($7,600) if there were twenty-seven missing lights as plaintiff contends. Def. Mem. at 19.

PG 1044 maintains that defendants' cost estimate is not reliable because their expert does not include all needed repairs, and because the estimate is not based on competitive pricing. In addition, defendants' expert did not physically examine the Premises. Tr. at 258, 203, 205, 207–08, 233, 235, 238, 243–44, 255; Pl. Mem. at 17.

The Court finds that PG 1044's claim of diminished market value has not been sustained. There is no evidence that the asking price of $175,000 in July 2001 was a reasonable market price, and there is no support for the claimed $25,000 per year loss. Indeed, the evidence indicates that PG 1044 benefitted from the new lease, as Sirene One would have paid only $110,000–$120,000 per year during the remainder of the lease. Tr. at 43. Accordingly, PG 1044's claim of diminished market value is **DENIED**.

PG 1044's position that it had to restore the Premises to a "vanilla shell" is similarly not acceptable. Tr. at 37, 54–55; Pl. Mem. at 15; Pl. Reply Mem. at 7. There is no reason to speculatively award the monies for a complete renovation of a "gutted premises" when the Premises were not gutted, and when the Premises were re-let to another beauty salon for the same purpose at an increased rental price. Similarly, PG 1044's contention that the Premises were "demolished" is not supported by the evidence. While the Premises were in need of some repair, neither parties' estimate for cost of repair is acceptable. Judson failed to factor in competitive pricing. Defendants not only failed to factor in competitive pricing, but did not include some fixtures. The Court nevertheless credits defendants' expert that the neces-sary repairs could have been done without complication or substantial delay. Based on the evidence presented, the Court finds that a reasonable cost of repair is $22,800 in damages to PG 1044.

**D. Karen Wu as Personal Guarantor**

■ Defendants breached the settlement agreement, Lease, and Stipulation requirements that the Premises be left broom clean. They also breached the settlement requirement that payments be made in a timely manner. PG 1044 asserts that Karen Wu's limited guaranty in the settlement agreement makes her personally liable for these breaches. Pl. Mem. at 21–22; Pl. Reply Mem. at 10. PG 1044 cannot, however, enforce the limited guaranty. Although Judson testified that defendants did not have permission to stay past December 31, 2004, he accepted payment after that date. Tr. at 15, 70; Def. Mem. at 20. "[W]here a party to an agreement has actual knowledge of another party's breach and continues to perform under and accepts the benefits of the contract, such continuing performance constitutes a waiver of the breach." *Franklin Pavkov Construction Co., v. Ultra Roof, Inc.*, 51 F.Supp.2d 204, 217–218 (N.D.N.Y. 1999) (*citing National Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 675 (S.D.N.Y. 1991), *aff'd sub nom. Yaeger v. National Westminster*, 962 F.2d 1 (2d Cir.1992) (citations omitted)); *see also Intermetal Fabricators, Inc., v. Losco Group, Inc.*, 2000 WL 1154249 *7 (S.D.N.Y. Aug. 14, 2000). Consequently, the right to enforce the liability provision terminated as soon as that payment was accepted during defendants' holdover. *See National Westminster Bank*, 130 B.R. at 675. Wu's derivative liability therefore also ended.

**E. Attorney's Fees**

Under ¶ 50b of the Lease, PG 1044 is entitled to attorney's fees resulting from a

successful action. As PG 1044 has partially succeeded in this action because it demonstrated that defendants damaged the Premises in question, thus violating ¶ 15 of the parties' settlement agreement, plaintiff is entitled to an award of attorney's fees. PG 1044 requests approximately fifty-thousand dollars ($50,000) in fees for approximately one hundred and fifty-seven hours billed. Pl. Mem. at 19; Pl. Reply Mem. at 13; PX 9.

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Reiter v. Metropolitan Transportation Authority of New York,* 2004 WL 2072369, at *1 (S.D.N.Y. Sept. 14, 2004)(*quoting Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40). This type of calculation is commonly known as the "lodestar" calculation. "Plaintiff must submit ... documentation ... that enable[s] the *court* to determine whether his apportionment was proper." *Chambless v. Masters, Mates & Pilots Pension Plan,* 1988 WL 80170. at *6 (S.D.N.Y. July 21, 1988), *aff'd in part, rev'd in part on other grounds,* 885 F.2d 1053 (2d Cir.1989) (emphasis in original). Where documentation of hours is inadequate, the court may reduce fees accordingly; there is no need to dissect submissions line by line. *See Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

■ Defendants devote a considerable portion of their argument to the contention that because PG 1044 has been unsuccessful, the award ought to be reduced accordingly. Def. Mem. at 22–24. As pointed out by defendants, there are several problems with PG 1044's submissions on fees, including double-billing by counsel, charges for litigation expenses from other unrelated actions, failure to submit data on counsel's experience or community practice standards, and vagueness in descriptions of work performed. Def. Mem. at 22–26. Furthermore, PG 1044 should not be compensated for claims they did not win. While ¶ 50b provides for fees, the limited success of plaintiff, combined with the problems identified, require a significant reduction in the requested fee. The Court finds that a reduction of 50% fairly compensates plaintiff. Accordingly, the Court awards $25,000 in fees and costs to PG 1044.

## F. Third–Party Defendant Wei

Defendants claim that third-party defendant Wei is liable for whatever damage may have been done to the Premises. Tr. at 18–19, 21–22, 59–60; Def. Mem. at 2, 5, 13–15. They claim that Wei, with the assistance of an unidentified friend, stole fixtures and damaged the Premises during her hour and a half visit on January 5, 2002. Defendants have estimated that approximately six thousand dollars ($6,000) would redress the property damage. Tr. at 18–19, 21–22, 59–60; Def. Mem. at 2, 5, 13–15. However, defendants' claims are not supported by the evidence. Wu testified that as the Exhibit 1 fixtures were useless to her, she "gave" or "threw them away." Tr. at 123. On the other hand, Wu also testified that she sold the fixtures to Wei as part of an agreement to transfer ownership of the Sirene One location to Wei, even though the terms of the Lease preclude this possibility. Tr. at 97–101; PX 1 ¶¶ 22, 65.

The testimony of Roger Levitt ("Levitt"), Wu's business partner, who helped Wu sell the fixtures, further undermines the credibility of defendants' claims against Wei. Tr. at 144–45. Levitt testified that a contractor removed all the fixtures before Wei arrived on the Premises January 5, 2002. Tr. at 155–56. More-

over, defendants admitted at trial that Wu hired the contractor that removed the fixtures. Tr. at 128–134, 142.

Overall, defendants' claim that Wei and a friend caused at least $6,000 of damage in under two hours, without the assistance of either tools or contractors, is not credible. Accordingly, Wei is not liable to any party in this case. Consequently, as Wei is not liable, her claims of faulty jurisdiction are moot.

### III. CONCLUSION

For the above described reasons, plaintiff's holdover claim is **DENIED**. Plaintiff's conversion claim with respect to the Exhibit 1 fixtures is **GRANTED** and plaintiff is entitled to $2,500 on that claim. Plaintiff's claim for property damage caused by the removal of trade fixtures is **GRANTED** and plaintiff is entitled to $22,800 on that claim. Plaintiff's claim that Wu is personally liable for defendant Siren One's conduct is **DENIED**. Plaintiff's claim for reimbursement of its attorney's fees is **GRANTED**, and the Court awards plaintiff $25,000 in fees and costs. Finally, defendants' claim against third-party defendant Jeanette Wei is DENIED.